The BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 1 in the CITY AND COUNTY OF DENVER; Thomas M. Mauro, Sharon R. Bailey, Lynn D. Coleman, Aaron M. Gray, J.P. Hemming, Carole R. McCotter, and Marcia M. Johnson, in their official capacities as members of the Board of Education; and Sharon Eastlund, Petitioners/Cross–Respondents,

v.

Cordia BOOTH, James Stamper, Eugene Copeland, and Bill King, on behalf of the proposed Thurgood Marshall Charter Middle School, Respondents/Cross–Petitioners,

and

The Colorado State Board of Education, Respondent.

No. 97SC609.

Supreme Court of Colorado, En Banc.

Sept. 13, 1999.

Semple, Miller, DeLay & Mooney, P.C., Patrick B. Mooney, Martin Semple, Michael H. Jackson, General Counsel, Denver Public Schools, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent Board of Education of School District # 1.

Collins & Pringle, Dwight L. Pringle, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent Sharon Eastlund.

Rothgerber, Appel, Powers & Johnson, LLP, Gregory B. Kanan, Denver, Colorado, Dimanna & Jackson, Daniel A. Sweetser, Denver, Colorado, Parcel, Mauro, Hultin & Spaanstra, P.C., Gwen J. Young, Susan J. Keller, Denver, Colorado, Attorneys for Respondents/Cross–Petitioners Cordia Booth,

James Stamper, Eugene Copeland and Bill King.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Antony B. Dyl, First Assistant Attorney General, State Services Section, Denver, Colorado, Attorneys for Respondent Colorado State Bd. of Education.

Miller & DeLay, P.C., Kenneth A. DeLay, Westminster, Colorado, Attorneys for Amici Curiae School District No. 12, Adams County La Veta Re–2 School District.

Caplan and Earnest, LLC, Susan S. Schermerhorn, W. Stuart Stuller, Boulder, Colorado, Attorneys for Amici Curiae Telluride School District R–1 Moffat School District 2.

James W. Griffin, Lakewood, Colorado, Attorney for Amicus Curiae Colorado League of Charter Schools.

Kutz & Bethke, William P. Bethke, Lakewood, Colorado, Attorneys for Amici Curiae Crestone Charter School, Jefferson Academy, Laurent Clerc Educational Fund of Colorado d/b/a Magnet School of the Deaf, and Summit Middle School.

Julie Murphy Seavy, Lauren B. Kingsbery, Denver, Colorado, Attorneys for Amicus Curiae Colorado Association of School Boards.

Chief Justice MULLARKEY delivered the Opinion of the Court.

This case involves a challenge to the constitutionality of the second-appeal provision of the Charter Schools Act. *See* § 22–30.5–108(3), 7 C.R.S. (1998). The question is whether the General Assembly constitutionally may authorize the State Board of Education to order a local school board to approve a charter school application that the local board has rejected when the State Board finds approval to be in the best interests of the pupils, school district, or community. We hold that the second-appeal provision is constitutional.

Both the petitioners/cross-respondents, Sharon Eastlund and the Board of Education of School District No. 1 in the City and County of Denver (Denver Board), and the respondents/cross-petitioners, the Thurgood Marshall Charter Middle School applicants, appeal the judgment in *Booth v. Board of Education of School District Number 1*, 950 P.2d 601 (Colo.App.1997). The Colorado State Board of Education intervened as plaintiffs before the district court and is a respondent on appeal. We granted certiorari to resolve the following issues: 1) whether the Charter Schools Act's second-appeal provision, section 22–30.5–108(3), 7 C.R.S. (1998), violates the Colorado Constitution insofar as it purports to authorize the State Board to direct a local board of education to approve a specific charter school; 2) whether, on a second appeal under section 22–30.5–108(3), the State Board must order approval of the specific pending charter school application where it finds that the final decision of the local board of education was contrary to the best interests of the pupils, school district, or community; and 3) whether the court of appeals erred in holding that the question of the constitutionality of the Charter Schools Act second-appeal provision is not ripe for determination. For clarity and simplicity we will refer collectively to the petitioners/cross-respondents as "the Denver Board" and to the respondents/cross-petitioners as "the charter applicants."

## I. FACTS AND PRIOR PROCEEDINGS

In 1993 the General Assembly enacted legislation providing for the creation of charter schools in Colorado. *See* §§ 22–30.5–101 to –115, 7 C.R.S. (1998) (Charter Schools Act). The Charter Schools Act establishes a process by which individuals or groups may apply to a local school board for a charter, *see* § 22–30.5–107, and a process for any interested party to appeal to the State Board from an adverse decision denying the application, *see* § 22–30.5–108.

Individuals or groups wishing to open a charter school apply to the local board in the school district where the school would operate. An application must detail the proposed school's structure including, among other things, its mission, goals, program, curriculum, governance, economic plan, transportation plan, enrollment policy, and legal obligations. *See* § 22–30.5–106. The application

receives a preliminary review from the district accountability committee, then a decision by the local board. *See* § 22–30.5–107. An approved application "shall serve as the basis for a contract between the charter school and the local board of education." § 22–30.5–105(1).

Any interested party can appeal an adverse decision of a local board regarding a charter application. *See* § 22–30.5–107 & – 108. If a local board denies an application, it must specify the grounds for the denial. *See* § 22–30.5–107(4). An appeal is limited to the grounds that the local board specifies. *See* § 22–30.5–108(2). On a first appeal, the State Board either affirms the local board's decision or remands with specific recommendations for reconsideration. *See* § 22–30.5–108(3)(a). If, after a remand, the local board again denies the application, a charter school applicant can make a second appeal to the State Board. *See* § 22–30.5–108(3)(c). For each appeal, the State Board considers whether the local board's decision was "contrary to the best interests of the pupils, school district, or community." § 22–30.5–108(3)(a), (d). On a second appeal if the State Board finds the local board's decision was "contrary to the best interests," it remands the decision "with instructions to approve the charter application." § 22–30.5–108(3)(d) (second-appeal provision).[1]

On December 21, 1993, members of the Denver Public Schools (DPS) community submitted an application for the Thurgood Marshall Charter Middle School (Thurgood Marshall School). The charter applicants proposed implementing a core DPS curriculum in a nontraditional manner. The application describes a school that operates on a "limited resource model." Four or five teachers are assigned to "teams" of approximately seventy-two students. Students learn in integrated "blocks" according to their learning needs. In addition, small class sizes

would permit students with a range of backgrounds and abilities to learn together. This structure anticipates addressing both special education and gifted and talented learning needs within the regular classroom rather than through separate programs.

The DPS improvement and accountability council, evaluating conceptual merit, ranked Thurgood Marshall School second among the charter applications submitted in 1993. Nevertheless, on February 17, 1994, the Denver Board denied Thurgood Marshall School's application. The Denver Board's concerns included the lack of an appropriate site for the school, inadequacies in the budget, "excessive per pupil funding requests," and inconsistencies in the proposed teacher grievance procedure.

The charter applicants appealed the Denver Board's decision to the State Board pursuant to section 22–30.5–108(1). On April 6, 1994, the State Board reversed the Denver Board's decision and remanded for reconsideration. The remand included instructions for the parties to reevaluate and negotiate several issues related primarily to the proposed school's site and its financial relationship with the district.

After the first State Board appeal, the charter applicants worked primarily to address the issue of site. DPS informed them that, among other possibilities, Slavens Elementary School (Slavens) might become available. At the time, Slavens housed administrative offices.

In their application submitted for reconsideration, the charter applicants proposed using Slavens. On May 19, the Denver Board issued a resolution recognizing "the community support of and interest in the education philosophy" of the proposed school, but denying the application for the 1994–95 school year because the Denver Board's initial concerns had not been resolved. The Denver

---

1. The challenged provision, in its entirety, reads: Within thirty days following receipt of the second notice of appeal or the making of a motion for a second review by the state board and after reasonable public notice, the state board, at a public hearing, shall determine whether the final decision of the local board of education was contrary to the best interests of the

pupils, school district, or community. If such a finding is made, the state board shall remand such final decision to the local board with instructions to approve the charter application. The decision of the state board shall be final and not subject to appeal.
§ 22–30.5–108(3)(d).

Board encouraged the charter applicants to reapply for the following school year.

The charter applicants filed a second appeal with the State Board. *See* § 22–30.5–108(3)(c). On July 18, 1994, the State Board found the Denver Board's decision to be contrary to the best interests of the pupils, school district, or local community; ordered approval of the Thurgood Marshall School charter application; and directed the parties "to submit a status report outlining their progress with respect to budget, site, enrollment, and employment on or before December 1, 1994."

The parties filed at least one joint status report before the charter applicants filed a mandamus action in Denver District Court seeking injunctive relief. They sought to compel the Denver Board's compliance with the State Board's order to approve the charter application. On March 27, 1995, the district court issued a preliminary injunction enjoining the Denver Board "from taking any action contrary to the July 1994 Order of the State Board." Then, on January 12, 1996, the court ordered the Denver Board to approve the Thurgood Marshall School charter "in the basic form of the application as it was submitted in July 1994." This order was later amended to require the Denver Board "to grant the Charter for Thurgood Marshall Charter Middle School." The district court stayed the order pending an appellate ruling on the constitutionality of the Charter Schools Act, and both parties appealed.

On appeal, the Denver Board argued that the State Board's order exceeded the scope of its statutory authority and that the statute itself was unconstitutional. The court of appeals reversed the district court's ruling, finding that, rather than ordering approval of the specific terms of the proposed charter, the State Board had attempted to require approval of the charter "in principle" while directing the parties to continue their negotiations. *See Booth,* 950 P.2d at 606. The court concluded that this action was outside the State Board's statutory authority under section 22–30.5–108(3)(d) and remanded with directions for the State Board to reconsider. *See id.* It dismissed the Denver Board's

constitutional challenge as not ripe. *See id.* at 607.

We agree with the court of appeals' judgment that nothing in the Act's language authorizes the State Board to require status reports but not with its conclusion that the State Board's order must be reconsidered. Furthermore, we disagree with the court of appeals' decision not to reach the constitutional challenge. That issue is ripe for adjudication, and we find that section 22–30.5–108(3)(d), the second-appeal provision, is constitutional.

## II. RIPENESS

First, we address the court of appeals' decision declining to reach the constitutionality of section 22–30.5–108(3)(d). The Uniform Declaratory Judgments Law affords courts the authority "to declare rights, status, and other legal relations whether or not further relief is or could be claimed." § 13–51–105, 5 C.R.S. (1998). The statute is remedial and must be liberally construed and administered. *See* § 13–51–102, 5 C.R.S. (1998); *Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231, 240 (Colo.1984).

The Denver Board asserts that it has presented a facial challenge to the validity of the second-appeal provision and that, based on our decision in *Fred Schmid Appliance & Television Co. v. City & County of Denver,* 811 P.2d 31 (Colo.1991), it is entitled to a declaratory judgment on the provision's constitutionality. The charter applicants have not disputed this issue. Nevertheless, the court of appeals relied on *Mt. Emmons Mining Co.* to conclude that, because the State Board acted outside its statutory authority, the constitutionality of State Board action in conformity with the statute was not ripe. *See Booth,* 950 P.2d at 607. We disagree with the court of appeals' conclusion.

The parties in this case have completed the statutorily prescribed appeals process. In addition, we need not assume any facts to address the Denver Board's challenge to the constitutionality of the appeal procedure itself. *Compare Mt. Emmons Mining Co.,* 690 P.2d at 242 (finding summary judgment had been granted "based on a series of as-

sumed facts") *with Fred Schmid Appliance & Television Co.*, 811 P.2d at 33 (finding exhaustion irrelevant where taxpayers challenged the constitutionality of the administrative procedures themselves). In addition, the Denver Board currently faces substantial uncertainty regarding the legal status of the proposed Thurgood Marshall School. *See Toncray v. Dolan*, 197 Colo. 382, 384, 593 P.2d 956, 957 (1979) (finding declaratory judgment appropriate where taxpayers' future liability for income taxes depended upon statute's construction). Therefore, we find that the constitutionality of section 22–30.5–108(3)(d) is ripe for review, and we exercise our jurisdiction in the following manner.

In Part III of this opinion, we define the bounds of the State Board's authority pursuant to article IX, section 1 (III.A.) and the local board's authority pursuant to article IX, section 15 (III.B.). In Part IV, we consider the second-appeal provision. We examine the scope of the State Board's review (IV.A.), the extent of its authority in reversing a local board's decision (IV.B.), and the effect of an instruction ordering a local board to approve a charter application (IV.C.). Then, finding the second-appeal provision to be valid in light of the constitutional principles established in Part III, we apply it to the facts of this case (IV.D.). Finally, in Part V, we address the Denver Board's separate challenge based on article IX, section 16 of the constitution: Textbook Selection.

## III. ARTICLE IX: EDUCATION

The Denver Board's first constitutional challenge requires us to consider the interplay between the second-appeal provision in section 22–30.5–108(3)(d) of the Charter Schools Act and two sections of Article IX of the Colorado Constitution. Article IX, section 1 vests "general supervision" of public schools in the State Board. The Education Article also requires the General Assembly to organize school districts "of convenient size," whose local boards "shall have control of instruction." Colo. Const. art. IX, § 15. The central issue is whether the second-appeal provision is a legitimate means of attaining the General Assembly's goals in light of article IX, sections 1 and 15.

The Denver Board asserts that any State Board decision ordering a local board to approve a specific charter application exceeds the state's general supervisory power and impermissibly encroaches on a local board's control of instruction, including its educational resources. The charter applicants contend that the State Board's authority under section 22–30.5–108(3)(d) is consistent with its general supervisory powers. They assert that the General Assembly's plenary power to create, abolish, and define the territory of school districts implies the power to modify or withdraw the local district's powers "as it pleases."

Neither of these sweeping categorical arguments is persuasive because each fails to recognize or reconcile the potential for competing responsibilities created by the constitution. First, the Denver Board's argument, taken literally, would render the General Assembly powerless to regulate public education in a manner consistent with its constitutional obligations. The General Assembly is charged with "provid[ing] for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state." Colo. Const. art. IX, § 2. Any meaningful regulation in furtherance of this responsibility, whether it involves curriculum, facilities, programs, management, services, or employment, will inevitably influence the allocation of resources. Yet the Denver Board suggests that *any* impact violates its control of instruction. We will not seriously entertain the notion that the General Assembly's constitutional responsibility for public education can be carried out only to the extent that its regulations have no discernible effect on local resources.

Similarly, with respect to the charter applicants, we cannot read article IX, section 1 as broadly and article IX, section 15 as narrowly as they suggest. It is beyond dispute that local governments assume a central role in administering public education. The United States Supreme Court has consistently emphasized principles of local control, separate and distinct from issues of federalism, in the context of public schools. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (noting that local control permits tailoring of educational programs to local needs); *Wright v. Council of the City of Emporia*, 407 U.S. 451, 469, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (recognizing that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society"); *Wright*, 407 U.S. at 478, 92 S.Ct. 2196 (Burger, C.J. dissenting) (arguing that "[l]ocal control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well"); *see also Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (recognizing public education as "perhaps the most important function" of local as well as state governments).

The framers' inclusion of article IX, section 15 makes Colorado one of only six states with an express constitutional provision for local governance, underscoring the importance of the concept to our state.[2] As a result, this court has consistently emphasized principles of local control. *See, e.g., Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1021 (Colo. 1982) ("The historical development of public education in Colorado has been centered on the philosophy of local control.").

■ As long as a school district exists, the local board has undeniable constitutional authority.[3] However, just as even core constitutional rights are not absolute, this constitutional authority is subject to limits. The contours of constitutional rights are typically determined by balancing competing interests.[4] This is true particularly, as here, in the context of administrative agencies. *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (holding that due process rights to a pretermination hearing are limited by "balancing of the competing interests at stake"); *accord Adams County Sch. Dist. No. 50 v. Dickey*, 791 P.2d 688, 696 (Colo. 1990) (applying *Loudermill* standard). In this case, the constitution requires balancing the local board's interest in exercising control over instruction with the State Board's interest in asserting its general supervisory authority. It is a balance that first must be struck by the legislature and, if challenged, reviewed by the courts.

## A. Article IX, Section 1: General Supervision

The first clause of the Education Article of the Colorado Constitution reads: "The general supervision of the public schools of the state shall be vested in a board of education whose powers and duties shall be as now or hereafter prescribed by law." Colo. Const. art. IX, § 1(1). The meaning of the phrase "general supervision" is central to this dispute. Yet we have never been called previously to define it, either independently or in relation to a local board's control of instruction. We do so now, using the common meaning of the language as a foundation for implementing "the intent of the [constitution's] adopters." *Board of Educ. v. Spurlin*, 141 Colo. 508, 514, 349 P.2d 357, 360 (1960); *accord Alexander v. People*, 7 Colo. 155, 167, 2 P. 894, 900 (1884) (stating that "the constitution derives its force ... from the people

---

**2.** For analogous state provisions, *see* Fla. Const. art. IX, § 4 (providing that local school boards "shall operate, control and supervise" district schools); Ga. Const. art. VIII, § 5 (vesting local boards with authority to "establish and maintain" district schools); Kan. Const. art. VI, § 5 (providing that local public schools "shall be maintained, developed and operated by locally elected boards"); Mont. Const. art. X, § 8 (vesting "supervision and control of schools" in local boards); Va. Const. art. VIII, § 7 (vesting "supervision of schools" in local boards).

**3.** By contrast, the General Assembly "has almost unlimited power to abolish, divide or alter school districts." *Hazlet v. Gaunt*, 126 Colo. 385, 397, 250 P.2d 188, 194 (1952). This power might be

dispositive with respect to the validity of legislation providing for creation of independent charter school *districts*. *See* §§ 22–30.5–201 to –209, 7 C.R.S. (1998). That statute is not at issue here.

**4.** For example, freedom of speech, perhaps our most cherished individual right, is frequently subject to a case-by-case balancing. *See Hill v. Thomas*, 973 P.2d 1246, 1253 (Colo.1999) (balancing free speech interest with state interest in effectuating exercise of constitutional right to privacy); Laurence H. Tribe, *American Constitutional Law* § 12–2, at 792 (2d ed.1988) (discussing balance between the value of free expression, on the one hand, and the government's regulatory interest, on the other).

who ratified it, and their understanding of it must control").

■ Where the language of the constitution is plain and its meaning clear, we will enforce that language as written. *See Colorado Ass'n of Pub. Employees v. Lamm*, 677 P.2d 1350, 1353 (Colo.1984). The primary definition of the term "general" is "involving or belonging to the whole of a body, group, class, or type: applicable or relevant to the whole rather than to a limited part, group, or section." *Webster's Third New International Dictionary* 944 (1986). During the constitutional convention, the framers specifically amended the Education Clause to describe the State Board's supervision as "general" in nature. *See Proceedings of the Constitutional Convention: Colorado 1875–1876*, at 353 (1907). "Supervision," in turn, typically denotes "direction, inspection, and critical evaluation." *Webster's* 2296. Therefore, our definition begins with the presumption that the framers intended the State Board to provide direction, inspection, and critical evaluation of "the whole" in the sense of contributing a statewide perspective to decisions affecting public schools. This expectation is reflected in an election process that ensures statewide representation on the board. *See* Colo. Const. art. IX, § 1(1); § 22–2–105(1), 7 C.R.S. (1998) (providing for election of a member of the State Board from each congressional district).

Our understanding of "general supervision" is supported by the territorial legislature's use of the phrase at the time of its adoption into the Colorado Constitution. *See Marshall v. School Dist. # 3 Morgan County*, 191 Colo. 451, 453, 553 P.2d 784, 785 (1976) (relying on contemporaneous legislation to inform an understanding of the framers' intent regarding student access to free textbooks). Prior to statehood, the Territory of Colorado did not have a state board of education. Rather, it had a Territorial Superintendent of Public Instruction, County Superintendents for each county, and local boards of directors for individual districts. A primary duty of the Territorial Superintendent was "general supervision of all the County Superintendents and of all the public schools of the Territory." An Act to Amend,

Revise and Consolidate the Acts Relating to Public Schools, sec. 3, 1876 Colo. Sess. Laws 127, 128. Specific duties of the Territorial Superintendent included annual reports to the governor and legislative assembly, distribution of laws and regulations to the county superintendents, and distribution of any forms or certificates that the county superintendents were required to complete. *See id.*

Following statehood, the General Assembly continued to describe the State Superintendent as having "general supervision." In 1877 it elaborated on the Superintendent's characteristic responsibilities:

> He shall, on or before the tenth day of December, in every year preceding that in which shall be held a regular session of the general assembly, report to the governor the condition of the public schools ... with such suggestions and recommendations relating to the affairs of this office, as he may think proper to communicate. It shall be his duty to visit annually such counties in the state as most need his personal attendance, and all counties, if practicable, for the purpose of *inspecting* the schools, *awakening* and guiding public sentiment in relation to the practical interests of education, and *diffusing* as widely as possible, by public addresses and personal communication with school teachers and parents, *a knowledge of existing defects, and of desirable improvements in the government and instruction of schools.*

Colo. G.L. 2456, § 10 (emphasis added). This enumeration indicates that general supervision required, first and foremost, that the superintendent serve as an intermediary between the state government and local authorities regarding the status of the public education system as a whole. He was required to inform the governor and the legislature regarding the condition of public education and to make recommendations for its improvement. In addition he was required to disseminate to public schools, his "knowledge of existing defects, and of desirable improvements." *Id.* Therefore, "general supervision" implied both descriptive and prescriptive roles. The superintendent served as a conduit for information regarding the school system's present state and as a source

**648**

of ideas, recommendations and aspirations for its improvement.

■ We conclude that, pursuant to article IX, section 1(1), the constitutional framers contemplated general supervision to include direction, inspection, and critical evaluation of Colorado's public education system from a statewide perspective, that they intended the State Board to serve as both a conduit of and a source for educational information and policy, and that they intended the General Assembly to have broad but not unlimited authority to delegate to the State Board "powers and duties" consistent with this intent. Colo. Const. art. IX, § 1(1).

In addition to relying on contemporaneous legislative definitions of "general supervision," we also gain insight from the powers assigned originally to the State Board. Of the new State Board's few designated responsibilities, one is particularly relevant here. In 1877, the legislature established a procedure by which "any person aggrieved by any decision or order" of a local school board could appeal that decision first to the county superintendent and then to the State Board. Colo. G.L. 2533, § 81. The law provided that the State Board's decision "shall be final." Colo. G.L. 2533, § 87.

This statutory assignment of authority to the State Board in 1877 is analogous to the role given the State Board in the second-appeal provision now before us. Our research has not revealed any cases interpreting the effect of the 1877 act's delegation of final decision-making authority to the State Board. Nevertheless, because this delegation was contemporaneous with the constitutional framers' creation of the State Board in 1876, it is suggestive of the framers' intent regarding the permissible scope of the State Board's powers and duties, and it provides legislative precedent for the Charter Schools Act's designation of the State Board as final arbiter of disputes involving local boards.

**B. Article IX, Section 15: Control of Instruction**

■ Having considered the contours of the State Board's constitutional authority, we now turn to the role of local boards. A local board of education has one primary source of constitutional authority:

> The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. *Said directors shall have control of instruction in the public schools* of their respective districts.

Colo. Const. art. IX, § 15 (emphasis added). As with "general supervision," we look initially to the common meaning of "control" and "instruction." "Control" means "power or authority to guide or manage." *Webster's* 496. "Instruction" is generally defined as "the action, practice, or profession of one that instructs," and "the quality or state of being instructed." *Id.* at 1172. Thus, control of instruction requires power or authority to guide and manage both the action and practice of instruction as well as the quality and state of instruction.

■ In contrast with the lack of prior caselaw interpreting the State Board's general supervision, we have made numerous decisions that required us to consider the extent of a local board's control in specific circumstances. In one early line of cases, we determined that the General Assembly cannot require money raised in one district to be expended for instruction in another district without the first district's consent. *See School Dist. No. 16 v. Union High Sch. No. 1*, 60 Colo. 292, 294, 152 P. 1149, 1149–50 (1915); *see also Hotchkiss v. Montrose County High Sch. Dist.*, 85 Colo. 67, 69, 273 P. 652, 653 (1928); *Belier v. Wilson*, 59 Colo. 96, 98, 147 P. 355, 356 (1915). In *Union High School No. 1*, we stated that the legislature's action "clearly interfered" with the district's control of instruction because "[n]o discretion [was] left in the board of directors of the district . . . as to the character of high school instruction the pupils thereof shall receive at the cost of the district." *Union High Sch. No. 1*, 60 Colo. at 294, 152 P. at 1149. Thus, control of instruction requires substantial discretion regarding the character of instruction that students will receive at the district's expense.

More recently, we have encountered control of instruction concerns in a line of cases involving administrative review of teacher employment decisions. *See, e.g., Blaine v. Moffat County Sch. Dist. Re No. 1*, 748 P.2d 1280, 1286 (Colo.1988) (noting the local school board's "constitutional responsibility for the educational program in the public schools of the district"). The Denver Board relies on language in these cases emphasizing local control. *See id.* The charter applicants, on the other hand, point to the relevant statutes in these decisions as illustrating analogous permissible checks on local board authority.

The points made by both sides are well taken. Our decisions interpreting the Teacher Employment, Compensation, and Dismissal Act, *see* §§ 22–63–101 to –403, 7 C.R.S. (1998) (Teacher Tenure Act), have consistently upheld statutory schemes that limit local board authority, but they have also reflected an acute awareness that legislation must not usurp a local board's decision-making authority.

For example, we have clearly stated that ultimate findings of fact are within a local board's domain because it must retain "the power to determine what facts constitute the statutory grounds for dismissal." *Blair v. Lovett*, 196 Colo. 118, 125, 582 P.2d 668, 673 (1978). Similarly, we have emphasized that the General Assembly must reserve to local boards "the necessary latitude to determine whether ... the teacher's conduct *on the occasion in question* was sufficiently serious or aggravated to warrant an ultimate finding of insubordination and the serious sanction of dismissal." *Ware v. Morgan County Sch. Dist. No. Re–3*, 748 P.2d 1295, 1300 (Colo. 1988) (emphasis added) (citation omitted); *see also Blaine*, 748 P.2d at 1286 (finding that one purpose of the Teacher Tenure Act is to provide a school board with "the necessary means to carry out its constitutional responsibility for the education program in the public schools of the district").

In *People v. Heimer*, 919 P.2d 786 (Colo. 1996), we construed the scope of the court of appeals' review narrowly in teacher tenure cases to avoid "usurp[ing] the role of the board, either by elevating the hearing officer's recommendation to an equal plane with the board decision or by requiring the court of appeals to decline to give deference to the board decision." *Id.* at 790; *see also id.* at 795 (Scott, J. dissenting) (arguing that the statute's plain language required the court of appeals to substitute its judgment for that of the local board and, therefore, "impermissibly grants the court of appeals the power to effect public policy as to teacher retention or dismissal decisions").

 From these decisions, we derive several guiding principles. First, a local board's resolution of individual cases such as teacher employment decisions inherently implicates its ability to control instruction. Second, as a corollary, generally applicable law triggers control of instruction concerns when applied to specific local board decisions likely to implicate important education policy. Third, local board discretion can be restricted or limited in such circumstances by statutory criteria and/or judicial review. Fourth, such general statutory or judicial constraints, if they exist, must not have the effect of usurping the local board's decision-making authority or its ability to implement, guide, or manage the educational programs for which it is ultimately responsible.

 For circumstances in which the State Board and local boards have potentially conflicting authority, the reviewing court must strike a balance between local control of instruction and the State Board's general supervision. That balance will rarely be rigid. Indeed, it cannot be. Both local boards and the State Board exist to promote and serve the educational welfare of public school students in this state and, more broadly, to serve the state's democratic interest in a well-educated population. Inevitably, there will be instances in which the efforts of the two entities to fulfill their respective obligations will coincide or overlap. Occasionally, this overlap may generate conflict. As is evident from the fact that we have never previously been called to interpret "general supervision," these occasions are rare and their particular circumstances may be unforeseeable. Therefore, in the context of novel education reform legislation, we cannot attempt a definitive constitutional demarcation. Instead, taking the general principles

identified above, we must review each case on its facts.[5] Given this understanding, we turn to the statute whose language and operation are specifically before us.

## IV. SECOND-APPEAL PROVISION

The General Assembly has the constitutional authority and obligation to "provide for the establishment and maintenance of a thorough and uniform system of free public schools." Colo. Const. art. IX, § 2. Pursuant to the Charter Schools Act, the General Assembly's effort to improve the quality of public education includes a specific allocation of authority between the State Board and local boards. The issue is whether this allocation maintains a constitutionally permissible balance between the two entities.

To begin, we consider the Act's purpose. *See City of Durango v. Durango Transp. Inc.,* 807 P.2d 1152, 1157 (Colo.1991) (finding that constitutional analysis must consider the object a provision was intended to accomplish). The General Assembly intended the Charter Schools Act to create opportunities for innovation, autonomy, and reform in public schools. The declared legislative purposes include "encourag[ing] diverse approaches to learning and education, and the use of different, proven, or innovative teaching methods," § 22–30.5–102(2)(c); "the development of different and innovative forms of measuring pupil learning and achievement," § 22–30.5–102(2)(d); and "provid[ing] parents and children with expanded choices in the types of education opportunities that are available within the public school system," § 22–30.5–102(2)(f). The Act provides opportunities for individuals to organize public schools with independently designed curricula, program, and management structures that operate with substantial autonomy. *See* § 22–30.5–104(7)(a) ("A charter school shall be responsible for its own operation ...."); § 22–30.5–104(6) (providing opportunity for charter schools to "operate free from specified school district policies and state regulations").

None of the parties disputes the validity of the statutory purpose, and we likewise recognize that the goals are undoubtedly legitimate. *Cf. Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005, 1023 (Colo.1982) (finding that education funding system based on local taxes furthers legitimate goals of, among other things, experimentation and innovation). The Denver Board's contention is that the General Assembly has implemented the policy in a manner that infringes unconstitutionally on a local board's control of instruction.

In a case such as this, where the General Assembly has allocated authority between the State Board and local boards in order to further a legitimate educational purpose, we will give deference to the balance that it sought to maintain between the two entities. That is, we will presume the allocation is valid unless it clearly impedes the capacity of either the State Board or a local board to exercise its independent constitutional authority.

With this principle in mind, we consider the State Board's role on a second appeal: the scope of its review, the extent of its authority to issue orders, and the effect of an order instructing a local board to approve a charter application. The Denver Board has the burden of proving the statute unconstitutional beyond a reasonable doubt. *See Winslow Constr. Co. v. City & County of Denver,* 960 P.2d 685, 692 (Colo.1998).

### A. Scope of the "Best Interests" Review

The Denver Board argues that the "best interests" standard permits the State Board to make substantive determinations regarding a school's educational program that invade a local board's constitutional control of instruction. The charter applicants contend vigorously that the second-appeal provision is consistent with the State Board's supervisory authority, but they do so without addressing the scope of the State Board's

---

5. Our case-specific approach is consistent with that of other jurisdictions that have analogous local control provisions in their state constitutions. *See, e.g., State ex rel. Miller v. Board of Educ. of Unified Sch. Dist. No. 398,* 212 Kan. 482, 511 P.2d 705, 713 (1973) (declining to "draw the line with fine precision" between "advise" and "control").

review under section 22–30.5–108(3)(d). The court of appeals did not reach this issue.

■■■ We agree with the Denver Board that the second-appeal provision in section 108(3)(d) plainly requires the State Board to substitute its judgment for that of the local board. *See Askew v. Industrial Claim Appeals Office,* 927 P.2d 1333, 1337 (Colo.1996) (presuming "that the General Assembly meant what it clearly said" where the statutory language is unambiguous). Although the General Assembly has not previously used the "best interests" standard in the education context, the fact that statutory language is new or has not been used in a particular context before does not make it ambiguous. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.01 (5th ed.1992). Rather, we must adhere to the presumption that "the words express the intent of the legislature." *Id.* § 46.04.

The second-appeal provision authorizes the State Board to order a charter application's approval if it finds the local board's decision denying the application to be "contrary to the best interests of the pupils, school district, or community." § 22–30.5–108(3)(d). The phrase "pupils, school district, [and] community" aptly identifies the groups to whom a local school board is directly accountable. It is precisely these constituents to whom a local board answers when making educational policy decisions. That is, the local board was elected to approve or deny charter applications according to the best interests of its pupils, school district, and community. Under section 108(3)(d), the General Assembly has charged the State Board with deciding whether or not a local board made the correct decision.

Related statutes applying the same standard confirm our understanding of the plain meaning. In other contexts, the General Assembly has provided for decisions to be made in the "best interests" of children. *See, e.g.,* § 14–10–124, 5 C.R.S. (1998) (authorizing court to allocate parenting responsibilities according to "the best interests of the child" in marriage dissolution proceedings); § 15–14–204(1), 5 C.R.S. (1998) (authorizing court to appoint guardian for minor when it is "in the best interests of the minor"). Decisions

regarding the best interests of children are typically made in a court of law, are substantive, and require no deference to a prior decision maker. *See, e.g.,* § 14–10–124. In addition, when the General Assembly has sought to constrain discretion, it has done so by providing specific criteria that must guide a particular decision. *See id.;* § 15–14–204(1). The General Assembly has required no such adherence to statutory criteria for the State Board's review of a local board's charter application decisions.

We conclude that the "best interests" language is not reasonably susceptible to different meanings. Therefore, for purposes of our constitutional analysis, we hold that the State Board is authorized to substitute its judgment for that of a local board.

**B. Scope of State Board Instructions**

■■ Next we consider the State Board's statutory authority once it determines, on a second appeal, that the local board's decision was contrary to the best interests of the pupils, school district, or community. The court of appeals ruled that the State Board "has no authority ... other than to require the local board to approve the charter application." *Booth,* 950 P.2d at 606. The court concluded that the effect of an order to approve a charter application is to require approval of "all the specifics contained within the application." *Id.* at 607. It ordered the case remanded to the State Board for reconsideration on the assumption that the State Board might have decided differently had it properly understood the limits of its authority. *See id.*

The Denver Board agrees with this part of the court of appeals' judgment. According to the Denver Board, even if we find that an instruction to approve a charter application does not violate the state constitution, we must affirm the court of appeals' ruling that, in this case, the State Board had no statutory authority to order the parties to continue negotiating a charter agreement or to require status reports.

The charter school applicants do not dispute that section 108(3)(d) requires the State Board to order a charter application's ap-

proval. Instead, they contend that the State Board complied with the requirement and that, because an approved charter application may not resolve all matters pertinent to opening a school, the State Board has the implied authority to require status reports regarding unresolved matters. Finally, the charter applicants suggest that, even if the State Board's request for status reports exceeded its statutory authority, we should sever the ultra vires action from its proper instruction to approve the charter.

We hold that when the State Board reverses a local board decision, the plain language of section 108(3)(d) authorizes the State Board only to require approval of the charter application as submitted. As the court of appeals observed, the entire application process indicates legislative intent for efficiency and decisiveness. *See Booth,* 950 P.2d at 605. The process begins and ends within 120 days. *See* §§ 22–30.5–107 & –108. The General Assembly clearly defined the State Board's role: If the State Board finds the local board's decision to be "contrary to the best interests … it shall remand such final decision … with instructions to approve the charter application." § 22–30.5–108(3)(d). It does not authorize other action.

It is true that the Charter Schools Act must be construed liberally to achieve its purpose, *see* § 22–30.5–102(3), and certainly it is conceivable that status reports would further the Act's policy aims. However, where the balance of constitutional authority between state and local boards is at issue, we will not abruptly tip the scales in a manner for which the General Assembly has not expressly provided. Absent explicit language to the contrary, the State Board cannot require status reports in connection with its order instructing a local board to approve a charter application. Therefore, we affirm the court of appeals' judgment in this respect. We disagree, however, with the court of appeals' conclusion about the effect of a State Board's order instructing a local board to approve a charter application. We now address this issue.

### C. Effect of Charter Approval

■ The Denver Board asserts that an approved charter entitles the applicants to implement every element of the application regardless of concerns expressed by a local board. It argues that this result conflicts with a local board's constitutional control of instruction as well as its statutory authority "to determine which schools of the district shall be operated and maintained." § 22–32–110(*l*), 7 C.R.S. (1998); *see also Hawkins v. Cline,* 161 Colo. 141, 147, 420 P.2d 400, 403 (1966) (holding that, based on the statute, a local board has no duty to seek voter approval prior to closing a school even though there had been a prior merger agreement between two districts to submit such decisions to qualified electors).

If the Denver Board's interpretation of the statute is correct, the Thurgood Marshall School could open against the Denver Board's wishes and would be entitled to use the Slavens Elementary site. In addition to its broader legal challenges, the Denver Board has a specific concern that this site is unavailable because it is currently used for administrative purposes.

The charter applicants contend that the approved application serves as a blueprint for the school rather than as a binding contract. They suggest that the General Assembly intended the elements of a charter to be non-binding and negotiable between charter applicants and local boards even after approval. In effect, they assert that an approved charter provides the charter applicants with no guarantee that they will be able to open a charter school.

The court of appeals stated that "the approved application becomes a contract." *Booth,* 950 P.2d at 606. We disagree with this conclusion. We find the statute's language on this point to be ambiguous and reasonably susceptible to different interpretations. As a result, we look to the legislature's intent and to the consequences of different constructions. *See People v. Baer,* 973 P.2d 1225, 1228 (Colo.1999). We conclude from our analysis that the General Assembly did not intend an approved application to constitute a binding contract between the local board and the charter applicants.

The Charter Schools Act provides that "[a]n approved charter application shall serve *as the basis for* a contract between the charter school and the local board of education." § 22–30.5–105(1) (emphasis added). The phrase "as the basis for" could mean that approval itself creates a binding contract. This language can also denote an informal commitment. By comparison, the General Assembly used more definite language in a parallel provision authorizing creation of independent charter school districts. *See generally* §§ 22–30.5–201 to –209, 7 C.R.S. (1998) (Charter School District Act). Under the Charter School District Act, an approved charter constitutes an agreement, and "the terms thereof shall be *the terms* of a contract." § 22–30.5–206(1) (emphasis added). The meaning of "terms of" is plain regarding the status of a contract; the meaning of "basis for" is not.

If an approved charter application became the terms of a contract, then a State Board order to approve an application, substituting its judgment for that of the local board, would authorize a proposed charter school to operate under the terms of an application that the local board had rejected. This result would create a direct conflict with the local board's statutory authority "to determine which schools of the district shall be operated and maintained." § 22–32–110(*l*). Moreover, it might easily have the effect of usurping the local board's decision-making authority or its ability to implement the educational programs for which it is ultimately responsible. Such an effect would raise serious constitutional infirmities.

We will adopt an interpretation that causes both statutory and constitutional conflicts only if there is no plausible alternative as to the General Assembly's intent.[6] *See*

*Heimer*, 919 P.2d at 790 (noting that we must avoid a construction that raises constitutional infirmity as long as there is a reasonable alternative consistent with legislative intent); *Colorado State Bd. of Med. Exam'rs v. Jorgensen*, 198 Colo. 275, 278, 599 P.2d 869, 871 (1979) (finding that statutory provisions on the same subject matter should be construed, if possible, to avoid conflict with each other). The second-appeal provision does not present such a case. Instead, it represents an effort by the General Assembly to create opportunities for educational autonomy, innovation, and reform by combining independent initiative from charter applicants with education policy expertise at both local and state levels. This endeavor requires balance between state and local constitutional responsibilities for public education.

The General Assembly did not intend approval of a charter application to establish a final contract between the local board and the charter school proponents.[7] A statutorily complete application is not required to address two issues, site and funding, whose resolution is essential to the opening of a charter school. An application need not identify a site for the school, and, although it must include a proposed budget, *see* § 22–30.5–106(1)(g), it need not establish the district's funding obligation even though this issue is statutorily indeterminate and negotiable, *see* § 22–30.5–112(2)(a).

The Charter Schools Act addresses these issues separately. *See* § 22–30.5–112 (providing that "[t]he charter school and the school district shall begin discussions on the contract using eighty percent[8] of the district per pupil operating revenues"); § 22–30.5–104(7)(c) (requiring that a school district provide, without charge for rent, space in any school district facility "which is deemed available"). The possibility that a complete appli-

---

6. We have traditionally treated education policy choices with special deference and are particularly averse to the judicially intrusive effect of invalidating a statute in this context. *See Lujan*, 649 P.2d at 1018 (noting that judicial intrusion should especially be avoided when interpreting legislation addressing "the best public policy which can be adopted to attain quality schooling and equal educational opportunity for all children who attend our public schools").

7. Of course, charter school proponents and a local board may agree to treat an approved charter application as a final contract.

8. We take judicial notice that the General Assembly has since raised this figure to at least 95%, excluding administrative costs, beginning in the budget year 2000–2001. *See* H.B. 99–1113, 62d Gen. Assembly, 1st Reg. Sess. (1999) (signed into law March 31, 1999) (codified at § 22–30.5–112(2), 7 C.R.S. (1999)).

cation could leave site and funding issues unresolved indicates that the General Assembly did not intend an approved application to serve as a binding contract. Rather, an application's approval was intended to be an interim step toward creation of that contract.

In other words, we hold that the State Board's order instructing a local board to approve a charter application requires the charter applicants and the local board to resolve any issues necessary to permit the applicants to open a charter school. Therefore, when the State Board orders a local board to approve a charter application it is not requiring the local board to open a school. Rather, the State Board's action is consistent with its general supervisory authority requiring knowledge and dissemination of desirable improvements for the public education system. Expressing its judgment that a proposed school would serve the interests of an education community represents a valid means of disseminating its knowledge and stimulating desirable improvement. It is also consistent with the State Board's historic role as final arbiter of disputes involving local boards. *See* Part III.A. *supra* (discussing legislation contemporaneous with adoption of the Colorado Constitution).

This understanding of a State Board order to approve a charter application avoids constitutional infirmity. A local board has two opportunities to deny a charter and, in doing so, must state its reasons for the denial. *See* § 22–30.5–107(4). Denial of an application implicates a local board's control of instruction because it applies general education policy to the guidance and management of instruction in an individual case: the decision whether to open a particular school. The local board's concerns, reflected in its reasons for denying the application, do not lose their validity simply because the State Board finds that approval of the application, taken as a whole, is in the best interests of the education community. Rather, a local board can comply with a State Board order to approve a charter application and still expect

resolution of its initial grounds for denial in a satisfactory final agreement with the charter school applicants.[9] At the same time, the holders of an approved application have a reasonable expectation that the problems identified by the local board in its statement of grounds for denial can be resolved, an agreement on a final contract can be reached, and a charter school will open.

## D. The Thurgood Marshall School Application

In the present case, the proponents of the Thurgood Marshall School first proposed a school, based on a limited resource model, to the DPS improvement and accountability council for initial review pursuant to section 22–30.5–107(1). The council expressed enthusiasm for the proposal's conceptual merit, ranking it second among the applications submitted in 1993.

When the Denver Board reviewed the formal application, both initially and on reconsideration, it expressed no reservations regarding the potential benefits of a limited resource model. It explicitly recognized "the community support of and interest in the education philosophy." The Denver Board denied the application primarily because of concerns about the applicants' ability to *implement* the program effectively.

Two of the Denver Board's concerns went to site and per pupil funding. We have recognized already that these issues are critical to a complete plan for a school. We also have noted that the Charter Schools Act does not require these issues to be resolved as part of a charter application. Nevertheless, the charter proponents included specific site and per pupil funding requests in their application. Their inclusion, and the fact that the Denver Board found both of them to generate substantial resource concerns, identifies them as problems remaining to be resolved.[10]

In the course of this process the Denver Board has expressed other concerns that merit note here. For example, the Denver

9. We express no opinion regarding the effect on our analysis of an allegation that a local board's grounds for denial were pretextual in some manner. There is no such allegation before us.

10. With respect to funding, the parties dispute the proportional calculation of the funding request, but all agree that it is at least 105% of the statutorily defined per-pupil funding rate.

Board found that, apart from the per-pupil funding figure, the Thurgood Marshall School's proposed budget was inadequate because it relied on access to DPS equipment, such as computers, that was not available for the school's use. The charter proponents offered no evidence or arguments to contradict these conclusions.

In addition, the Denver Board expressed concern regarding the charter proponents' teacher grievance procedure. The proposed procedure included resolution of disputes by a principal, but the school's administrative structure does not include a principal. The charter proponents did not account for this discrepancy.

Compliance with the State Board's order instructing the Denver Board to approve the charter application does not invalidate these concerns. Instead, the order creates a good faith commitment on the part of the local board to work with the charter applicants toward resolving any remaining concerns and producing a satisfactory final contract that would permit the applicants to open the Thurgood Marshall School.

 In conclusion, we hold that the State Board did not infringe unconstitutionally on the Denver Board's control of instruction when it ordered approval of the charter application. Furthermore, we disagree with the court of appeals' judgment that the State Board's decision on second appeal requires reconsideration. The primary effect of the State Board's order is consistent with our holding today. The order to approve the charter application implicitly recognized that approval would not constitute a final contract and that the parties would be required to work together in good faith to resolve the Denver Board's remaining concerns. The State Board's request for status reports exceeded its statutory authority, but this ultra vires act does not affect the substance of its decision. Therefore, on remand, the State Board need not reconsider its decision. Rather, it can modify its order to comply with the limits of its authority as defined in this opinion.

## V. TEXTBOOK PRESCRIPTION

 The Denver Board's second constitutional challenge relates to textbook selection. The constitution specifically excludes textbook selection from the State Board's supervisory powers: "Neither the general assembly nor the state board of education shall have power to prescribe textbooks to be used in the public schools." Colo. Const. art. IX, § 16.

The Denver Board argues that a State Board order to approve a charter application has the effect of prescribing whatever textbooks the charter application proposes to use. The Denver Board asserts that such a prescription is a facial violation of article IX, section 16. The charter applicants respond that the Denver Board's challenge presents only hypothetical conflicts, does not amount to a facial challenge, and does not undermine the statute's application in this case.

Under the Charter Schools Act, the State Board's statutory review of a local board decision is limited to those grounds for denial specified by the local board. *See* § 22–30.5–108(2). In this case, the charter applicants' proposed choice of textbooks was not relevant either to the Denver Board's grounds for denial or to the State Board's reversal of that denial. In fact, the Denver Board could not have raised a plausible objection to the charter applicants' textbook selection because the charter applicants proposed to use the same textbooks used by other middle schools in the DPS system. Therefore, the State Board's review of the Denver Board's denial cannot be construed to implicate article IX, section 16 of the Colorado Constitution in this case.

Nevertheless, the Denver Board argues that, in another case, a local board might deny a charter based on the applicants' proposed textbook selection, and that, on a second appeal, the State Board might order the local board to approve the charter. The Denver Board hypothesizes that such a scenario would violate article IX, section 16. However, the State Board's order did not violate article IX, section 16 in this case, and

we decline to reach the Denver Board's hypothetical.[11]

## VI. CONCLUSION

We reject the court of appeals' judgment that the issue of constitutionality was not ripe. Instead, we reach the issue and conclude that the second-appeal provision strikes an appropriate balance between the respective constitutional powers of the State Board and local boards. In other words, it does not infringe unconstitutionally on a local board's control of instruction.

We agree with the court of appeals' interpretation of the State Board's authority on a second appeal and its ruling that the State Board exceeded its authority in this case. However, on remand from the district court, the State Board is not required to reconsider its decision; it need only modify its order to comply with the limits of its authority as defined here.

---

11. The Denver Board also attempts to characterize the Charter Schools Act as unconstitutional special legislation. *See* Colo. Const. art. V, § 25 (prohibiting the General Assembly from passing local or special laws "providing for the management of common schools"). It offers no legal support for its conclusory assertion, and we find no merit to the characterization.