Bill OWENS, in his official capacity as Governor of Colorado; and the State of Colorado, Defendants–Appellants

and

Kimble Breazell, in her own behalf and as next friend of her children, Devon Breazell, Desire Breazell, and Demetrik Breazell; Tracy A. Dominguez, in her own behalf and as next friend of her children, Manuel Thomas Dominguez, Steven Victor Dominguez, and Marissa Anne Dominguez; Patsy Hill, in her own behalf and as next friend of her children, Jonathan Hill and Antonio Hill; Charlene Howard, in her own behalf and as next friend of her children, Charles Howard and Carson Howard; Laura Huckabey, in her own behalf and as next friend of her grandchildren, Starlite McGuire and William Hodge; Bette Kelso, in her own behalf and as next friend of her grandchild, Amber Kelso; Kenya Knezevich, in her own behalf and as next friend of her children, Brian Walk and Andrew Walk; Rosa Morales, in her own behalf and as next friend of her children, Ray Morales and Joseph Morales; Angelia Teague, in her

own behalf and as next friend of her children, Denise Teague and Danielle Teague; Lisa Trujillo, in her own behalf and as next friend of her child, Dejerae Trujillo; Yvonne Trujillo, in her own behalf and as next friend of her children, Jacob Rodriguez and Kaitlyn Rodriguez; and Troylynn Yellow Wood, in her own behalf and as next friend of her child, Kimimila Irving Means, Intervenors/Defendants–Appellants,

v.

COLORADO CONGRESS OF PARENTS, TEACHERS AND STUDENTS; The Interfaith Alliance of Colorado; League of United Latin American Citizens; Colorado State Conference of Branches of the NAACP; Deborah A. Brennan and Alan J. Delollis, on Behalf of themselves and their minor child, Cameron Brennan; Carolyn Bartels and Howard Bartels, on behalf of themselves and their minor child, Hannah Bartels; Senator Patricia Hill Pascoe; Senator Dorothy S. Wham; Rabbi Joel R. Schwartzman; Reverend Dr. Cynthia Cearley; Francisco Cortez; Beverly J. Ausfahl; Theresa Solis; Danielle L. Waagmeester and William J. Waagmeester, on behalf of themselves and their minor children, Rachael Waagmeester, Madison Waagmeester, and Dane Waagmeester; Janet Tanner, on behalf of herself and her minor child, Benjamin Tanner; and Pamela Weber, on behalf of herself and her minor child, Kenneth Weber, Plaintiffs–Appellees.

No. 03SA364.

Supreme Court of Colorado, En Banc.

June 28, 2004.

Ken Salazar, Attorney General, Renny Fagan, Deputy Attorney General, John R. Sleeman, Jr., First Assistant Attorney General, Antony B. Dyl, Assistant Attorney General, Denver, Colorado, Attorneys for Defendants–Appellants.

Institute for Justice, William Mellor, Washington, DC, Hale Hackstaff Friesen, LLP, Richard A. Westfall, Denver, Colorado, Attorneys for Intervenors/Defendants–Appellants.

Colorado Education Association, Martha R. Houser, Charles F. Kaiser, Sharyn E. Dreyer, Gregory J. Lawler, Cathy L. Cooper, Denver, Colorado, Bredhoff & Kaiser, P.L.L.C., Robert H. Chanin, John M. West, Maryann Parker, Washington, DC, People for the American Way Foundation, Elliot M. Mincberg, Judith E. Schaeffer, Washington, DC, Americans United for Separation of Church and State, Ayesha N. Khan, Washington, DC, American Civil Liberties Union Foundation of Colorado, Mark Silverstein, Denver, Colorado, American Jewish Congress, Marc D. Stern, New York, New York, American Federation of Teachers, David Strom, Washington, DC, American Jewish Committee, Alan S. Jaffe, Jeffrey P. Sinensky, Kara H. Stein, New York, New York, Anti-Defamation League, Steven M. Freeman, New York, New York, Attorneys for Plaintiffs–Appellees.

Caplan and Earnest LLC, W. Stuart Stuller, Boulder, Colorado, Colorado Association of School Boards, Lauren Kingsbery, Denver, Colorado, Attorneys for Amicus Curiae Colorado Association of School Boards.

Justice BENDER delivered the Opinion of the Court.

In this case, we consider whether the Colorado Opportunity Contract Pilot Program ("Pilot Program" or "the program"), sections 22–56–101 to –110, 7A C.R.S. (2003), violates the local control provisions of article IX, section 15 of the Colorado Constitution.

The program was challenged in the district court by eight parents on behalf of their children as well as several concerned individuals and institutions (collectively "plaintiffs"). They are supported on this appeal by the Colorado Association of School Boards as amicus curiae. The program was defended by Bill Owens in his official capacity as Governor and twelve parents who intervened because they wanted their children to participate in the program (collectively "defendants").

The trial court found the Pilot Program interferes with the local school districts' discretion to allocate their funding, and therefore violates the local control requirement of article IX, section 15. The trial court also concluded that it could not interpret the program in a constitutional manner without effectively reading section 15 out of the constitution. Accordingly, the trial court concluded that the program was unconstitutional beyond a reasonable doubt.

The defendants appeal to this Court, arguing that the General Assembly has plenary authority to guide and implement educational policy.[1] Pursuant to this authority, the General Assembly has determined that the Pilot Program best serves the needs of children who "simply are not succeeding in the traditional school district setting."

The defendants contend that the local control provisions of article IX, section 15 do not place any impediment in the way of the General Assembly's power to enact the Pilot Program. First, the defendants argue that the program does not disturb the districts' authority over instruction in any way because students who participate in the program leave the district. Thus, the district retains control over instruction of those students who remain in the district.

Second, the defendants argue that school finance and educational policy have evolved significantly since this Court was first called upon to construe article IX, section 15. Today, the state provides the majority of funding to the public schools and regulates education far more comprehensively than it did when article IX was adopted. These changes in the practical management of the public schools, the defendants argue, have rendered the meaning of local control flexible enough to admit a program such as the Pilot Program into the management of the public schools.

Our task is to assess the constitutionality of the Pilot Program. We question neither the merits nor the wisdom of the policy decisions made by the General Assembly and embodied in this legislation. The defendants are correct that funding of the public schools has changed dramatically since article IX was adopted, and that the General Assembly has significant authority to guide and implement educational policy. However, article IX, section 15 creates and requires a structure of school governance that has remained unchanged since statehood despite these changes in school funding, and the Pilot Program does not comport with this constitutional structure.

Through article IX, section 15, the framers created a representative body to govern instruction in the public schools. The qualified electors of each district elect local school boards, who in turn "shall have control of instruction in the public schools of their respective districts." Beginning with *Belier v. Wilson*, 59 Colo. 96, 147 P. 355 (1915), this Court has consistently construed this provision to mean that local school districts must retain control over any instruction paid for with locally-raised funds. Indeed, more recently, in *Lujan v. Colorado State Board of Education*, 649 P.2d 1005 (Colo.1982), we held that our state-wide system of school finance is designed to preserve local control over locally-raised tax revenues, and that control over these funds is essential to maintain the democratic framework created by our state constitution. Control over locally-raised funds allows local electors to tailor educational policy to suit the needs of the individual districts, free from state intrusion. Without control over locally raised funds, the representative body mandated by our state

1. The defendants appealed directly to this Court pursuant to section 13–4–102(1)(b), 5 C.R.S. (2003), which gives this Court jurisdiction to review trial court decisions declaring a statute unconstitutional.

constitution loses any power over the management of public education.

Given the mandates of article IX, section 15, we hold that the Pilot Program violates the local control requirements of our state constitution because it directs the school districts to turn over a portion of their locally-raised funds to nonpublic schools over whose instruction the districts have no control. Irrespective of the fact that the goals of the program and the policy considerations underlying it are laudable, we see no way to reconcile the structure of the program with the requirements of the Colorado Constitution. To hold otherwise would render the local control provisions of article IX, section 15 meaningless.

Accordingly, we affirm the judgment of the trial court.

## Facts and Proceedings Below

The Colorado Opportunity Contract Pilot Program is designed to meet the "educational needs of high-poverty, low-achieving children in [Colorado's] highest-poverty public schools." § 22–56–102(1)(a), 7A C.R.S. (2003). Participation in the program is mandatory for any school district that, "for the 2001–02 school year, had at least eight schools that received an academic performance rating of 'low' or 'unsatisfactory' pursuant to section 22–7–604(5), and which . . . continues to operate said schools in the 2003–04 school year."[2] § 22–56–103(10)(a)(I). Other school districts may voluntarily participate in the program. § 22–56–104(1)(b).

The program is available to low-income, low-achieving children who attend public school in a participating school district. Only those children who are eligible to receive free or low-cost lunch under the National School Lunch Act may participate. § 22–56–104(2)(a). Academic criteria vary according to the child's age. A child in grades four through twelve may participate if the child was enrolled in public school during the previous year and performed at an "unsatisfactory" level in at least one academic area on the Colorado Scholastic Assessment Program (CSAP) or in reading, writing, or mathematics on the ACT college admission test. § 22–56–104(2)(b)(I)(A)–(B). A child in grades one through three may participate if the child lacks "overall learning readiness" due to at least three family risk factors as defined in section 22–28–106 and resides in a district in which the neighborhood school has been rated "low" or "unsatisfactory." § 22–56–104(2)(b)(II)(A)–(C).

If a child is eligible to participate in the program and has been accepted by a qualified nonpublic school, the child's parents may enter into a contract with the school district in which the child is enrolled. § 22–56–107(1). The school district is then required to make four assistance payments to the parents, who in turn must endorse the check "for the sole use of the participating nonpublic school." § 22–56–108(3) and (4)(a). The school district is required to pay the lesser of "the participating nonpublic school's actual educational cost per pupil," or a percentage of the school district's per pupil operating revenues. § 22–56–108(2)(a)–(b)(I–III).

As the program is currently enacted, enrollment is subject to statutory caps. During the 2004–05 school year, enrollment is limited to one percent of a participating school district's total student population. That percentage increases to two percent during the 2005–06 school year, four percent during the 2006–07 school year, and finally to six percent from the 2007–08 school year onward. See § 22–56–104(5)(a)(I)–(IV).

The plaintiffs challenged the program on several grounds, including that the program is special legislation in violation of article V, section 25 of the Colorado Constitution, and that the program violates the local control provisions of article IX, section 15 of the Colorado Constitution.[3] The plaintiffs moved

---

**2.** This standard applies to eleven school districts: Adams County School District No. 14, Aurora School District No. 28J, Colorado Springs School District No. 11, Denver County School District No. 1, Greeley School District No. 6, Harrison School District No. 2, Jefferson County School District No. R–1, Northglenn–Thornton School District No. 12, Pueblo School District No. 60, St. Vrain Valley School District No. RE–1J, and Westminster School District No. 50.

**3.** The Plaintiffs also brought the following challenges to the program:

for judgment on the pleadings on these two issues, and, in response, the defendants moved for partial summary judgment dismissing these issues.

The trial court first found that the program is not special legislation in violation of article V, section 25 of the Colorado Constitution and therefore dismissed that cause of action.[4] The court then turned to the question whether the program violates the local control provisions of article IX, section 15, and found the program unconstitutional.

Article IX, section 15 mandates the creation of school districts and provides a broad sketch of the districts' powers:

> The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts.

After an extensive review of our case law interpreting and applying section 15, the trial court concluded section 15 "mandates that the local district must have discretion over how money is spent to provide instruction for students who live in the district." The court then stressed that a substantial amount of funding for the program would come from local tax revenues, which have long been considered essential to effectuating local control over public education. The court found that implementation of the program is governed completely by statute and leaves the local school districts without discretion to determine which nonpublic schools or which students may participate.

The trial court concluded that because the school districts have no control over how locally-raised funds are spent or how the program is implemented, the program runs afoul of the local control requirement of article IX, section 15. The court found that it could not construe the program in a constitutional manner without interpreting section 15 "as being of so little import that the state can exert total control over a certain segment of instruction." Hence, the court concluded beyond a reasonable doubt that the program was unconstitutional.

The defendants now appeal to this Court, and urge us to hold that the Pilot Program comports with the mandates of article IX, section 15.

## Analysis

■ The defendants advance two arguments in support of the program. First, the defendants contend that the program does not impact a school district's control over instruction because students participating in the program leave the district to attend private school. The defendants interpret section 15 to require school district control only over instruction per se in the public schools. When a student leaves the district, the district no longer has any constitutional obligation regarding the instruction of that student, and therefore the district is no longer

(1) That the voucher program violates the free exercise of religion clause in article II, section 4 of the [Colorado] Constitution by making public funds available to sectarian private schools;

(2) That the voucher program violates article IX, section 7 of the [Colorado] Constitution mandating separation of church and state by making public funds available to sustain sectarian private schools and the religious organizations which sponsor them;

(3) That the voucher program violates the free exercise and establishment clauses of the Constitution by coercing parents to accept religious indoctrination for their children as the price for receiving a voucher;

(4) That the voucher program violates article V, section 34 of the [Colorado] Constitution by contributing state funds to charitable organizations not under control of the state and to denominational and sectarian institutions;

(5) That the voucher program violates article IX, section 3 of the [Colorado] Constitution restricting use of income from the public school fund; and

(6) That the voucher program violates article IX, section 2 of the [Colorado] Constitution by disrupting the uniformity of public education.

At the time of the trial court's decision, the Plaintiffs had announced their intention to abandon the fifth and sixth causes of action.

4. Because resolution of this case depends only on our interpretation of article IX, section 15, we do not reach the question whether the program constitutes special legislation.

accountable to those students who participate in the program.

Second, the defendants submit that the source of funds for the program is not relevant to an assessment of the program's constitutionality. The defendants emphasize the significant changes in "school finance and educational choice" since article IX, section 15 was adopted, and point to the failure of the school districts to meet the needs of the lowest-income, lowest-achieving students in the public schools. The defendants urge us to recognize that the General Assembly's supervisory powers over education are broad enough, and our constitution flexible enough, to permit the legislature to address this failure though enactment of the Pilot Program.

Our review of the history of article IX, section 15 and our case law construing it leads us to conclude that to accept these arguments would effectively delete the local control requirement from our state constitution. Because we see no way to reconcile the requirements of section 15 with the Pilot Program as it is currently enacted, we hold that the program is unconstitutional beyond a reasonable doubt.

### Local Control

The principle of local control has deep roots in Colorado's constitutional history. The Colorado Constitution was adopted in 1876 in an atmosphere of deep distrust of centralized authority. *See* Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 1 (2002). The document ultimately adopted was designed to "protect citizens from legislative misbehavior," and thus, while the delegates recognized that a legislature must inevitably be created, they "assiduously wrote provisions that took away much of [the General Assembly's] discretionary authority." *Id.* at 1–2.

The provisions governing education reflect the delegates' ambivalence about legislative power. Article IX, section 2 empowers the General Assembly to create and maintain a public school system:

The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously.

Article IX, section 15 then provides that control over instruction in the public schools shall devolve to local school boards, whose members are elected by the residents of the school districts:

The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts.

As it was initially drafted, however, article IX vested responsibility for public school instruction in the state board of education. *See Proceedings of the Constitutional Convention for the State of Colorado* 185 (1907). This draft prompted considerable debate, which focused on the wisdom of investing control over the public schools in a political entity. As one delegate put it, the fear was that article IX "gave the [State] Board the direction of the schools, therefore making the whole thing a political affair; there ought to be no possibility of a suspicion that politics should run the schools of the territory." *Constitutional Convention,* Denver Daily Times, Feb. 12, 1876.

This distrust of the political character of the state board was voiced in many ways. For example, several delegates expressed distrust of the state board's ability to resist political corruption in the area of text book selection, which they feared exposed the state board to "a mine of bribery and corruption." *Id.* These delegates urged that control over decisions such as text book selection "should be taken entirely out of politics, and put as near the people as possible." *Id.* In a similar vein, one delegate opined that allowing the state board to control text book selection would create a system "whereby school officers could line their pockets with money derived from the taxes of the people." *The*

*Constitutional Convention,* Denver Daily Tribune, Feb. 14, 1876. He insisted that the best way to avoid such corruption was to distribute decision making authority "to as small a degree as possible, and bring it home to each district. It should be left to the people at home." *Id.*

This theme of placing management of the public schools closer to the people was echoed in another aspect of the debate, which focused on the people who would comprise the state board. Some delegates objected to state control over instruction on competence grounds, stating "[t]he officers whom it was proposed to invest with the management of the schools must of necessity be politicians ... and the possibilities are that they would not know much about school affairs." *Constitutional Convention,* Denver Daily Times, Feb. 12, 1876. Ultimately, the delegates chose to confer responsibility for instruction, not merely text book selection, on the local school districts and entrust the state board of education with "general supervision" of the public schools.[5] *See* Colo. Const. Art. IX, §§ 1, 15, 16; *see also Bd. of Educ. v. Booth,* 984 P.2d 639, 646–47 (Colo.1999).

With the adoption of article IX, Colorado became one of only six states with an express constitutional local control requirement. *See Booth,* 984 P.2d at 646. In that provision, the framers made the choice to place control "as near the people as possible" by creating a representative government in miniature to govern instruction. And since its adoption, this Court has consistently emphasized the importance of local control to the state's educational system. *See id.*

#### The *Belier* line of cases

As the defendants point out, nothing in the language of article IX, section 15 connects local control over instruction to control over locally-raised tax revenues. However, beginning with *Belier,* this Court has had numerous occasions to define the contours of the local control requirement of section 15, and in each case we have held that control over

locally-raised funds is essential to effectuating the constitutional requirement of local control over instruction.

In *Belier,* we held that taxes raised in one school district could not be used to fund a public high school in another district. 59 Colo. at 98, 147 P. at 356. The legislation at issue in *Belier* allowed contiguous school districts to establish a union high school, which students who resided in either district could attend. Tax revenues raised in both districts were to be used to fund the union high school, while control over instruction would fall to the board of the district in which the union high school was located. We concluded that such a scheme violated the "letter and spirit" of article IX, section 15, because the electors in the paying district had no "voice in the selection of those who manage and control the school" in the receiving district. *Id.*

That same year, in *School District No. 16 v. Union High School No. 1,* we considered the constitutionality of a statute that allowed a student who resided in a district without a high school to attend a high school in a neighboring district at the expense of the student's district of residence. 60 Colo. 292, 152 P. 1149 (1915). As in *Belier,* we held that funds raised in one district could not be used to pay for public school in another district, and explained that imposing such a requirement on a local school district "clearly interfered with the control of instruction" in the paying district. *Id.* 60 Colo. at 293, 152 P. at 1149. Essential to this holding was the idea that local control requires a school district to have discretion over any instruction paid for with locally-raised funds. *Id.* (holding that the school district must retain discretion over "the character of ... instruction the pupils [of the district] shall receive *at the cost of the district* ") (emphasis added); *see also Hotchkiss v. Montrose County High Sch. Dist.,* 85 Colo. 67, 273 P. 652 (1928) (declaring invalid under article IX, section 15 a statute that permits a student to attend a public school in a neighboring district and

---

**5.** We have interpreted the "general supervision" clause to invest the state board with the power to direct, inspect, and evaluate the public education system, as well as to guide educational policy

throughout the State of Colorado. *Bd. of Educ. of Sch. Dist. No. 1 v. Booth,* 984 P.2d 639, 648 (Colo.1999).

compel her home district to pay tuition to the neighboring district).

Finally, in *Craig v. People ex rel. Hazzard,* we held that the General Assembly may accomplish inter-district funding without running afoul of article IX, section 15 only by drawing funds exclusively from the state-controlled public school income fund. 89 Colo. 139, 299 P. 1064 (1931). In that case, we rejected a challenge to a statute that permitted a high school student to attend a public school in a neighboring district in certain circumstances. Under the statute, in the event that a student attended a neighboring district's school, the superintendent of the state public school fund was authorized to withhold from the student's district an amount sufficient to pay the student's tuition and transfer that amount to the neighboring district. We held that this scheme comports with article IX, section 15 because it "only involves the apportionment of the public school fund by the superintendent of public instruction, and does not concern the apportionment, distribution, or expenditure *of county or school funds raised by taxation.*" *Craig,* 89 Colo. at 147, 299 P. at 1067 (emphasis added).

In the *Belier* era, we scrupulously honored the framers' preference, as expressed in article IX, section 15, for local over state control of instruction, even in the face of legislative efforts to address serious shortcomings on the part of local school districts. These cases confirmed the constitutional status of the local control requirement by stressing the importance of district control of locally-raised funds over and above the legislature's power to guide and implement educational policy.

The defendants frankly acknowledge that from a funding point of view, the General Assembly would have the authority to enact the Pilot Program but for the *Belier* line of cases, and accordingly they urge us to overturn them. The defendants argue that these cases should be understood as "limited to [their] facts" because they were decided at a time where state involvement in the management and funding of the public schools was far more limited than it is today. Thus, the defendants contend that these cases are simply inapplicable to today's cases involving modern school finance.

We cannot accept this proposition. The *Belier* line of cases is not, as the defendants argue, relevant only to an archaic system of public school management. We have reaffirmed the vitality of our interpretation of article IX in those cases many times since *Belier* and its progeny were decided, most recently to reject a constitutional attack posed to our state-wide system of public finance. *See Lujan,* 649 P.2d at 1021–22, 1023. If we were to abandon *Belier* now and uphold the Pilot Program, we would also, as we explain below, abandon the rationale of our public school finance system as we understood it in *Lujan.*

### Lujan

In *Lujan* we held that the local control provision of section 15 protects school districts against legislative efforts to require them to spend locally-raised funds on instruction that the district does not control, and preserves the districts' democratic framework.

In that case, we considered whether the Public School Finance Act violates the equal protection provisions of the Colorado Constitution or the mandate of article IX, section 2 that the state provide a "thorough and uniform" system of public schools. *See Lujan,* 649 P.2d at 1010. Under the Finance Act, the public schools derive a significant percentage of their operating income from local property tax revenues.[6] Because assessed property values vary from district to district, property-rich school districts are able to generate substantially more income from property tax revenues than property-poor school districts, which results in a disparity among

---

6. At the time we decided *Lujan,* approximately forty-seven percent of the schools' operating income was raised by local property tax levies. *Lujan,* 649 P.2d at 1010. While the exact percentage of operating income derived from local property taxes today is not a matter of record in this case, the parties agree that approximately forty percent of the public schools' current operating income comes from local property taxes and approximately sixty percent is provided by the state and other sources.

the income the districts receive. *Lujan*, 649 P.2d at 1013. Thus, for example, at the time *Lujan* was decided the Frisco School District was able to raise $386.52 per student, while the South Conejos School District raised only $23.60 per student. *Id.* at 1038 (Lohr, J., dissenting).

Applying rational basis review, we held that this disparity among districts in the amounts raised and spent per pupil does not violate the equal protection guarantees of our state constitution because the financing scheme achieves the important governmental purpose of fostering local control of education, as is required by article IX, section 15. *Id.* at 1023.

Our interpretation of article IX, section 15 in *Belier* was essential to this holding. First, we applied rational basis review, rather than strict scrutiny, to our analysis of the financing scheme in part because we rejected the argument that residents of poor school districts had been subjected to "a history of purposeful unequal treatment" as a result of disparate funding.[7] Relying on *Belier*, we noted that "[t]he historical development of public education in Colorado has been centered on the philosophy of local control," and that local taxation has traditionally been the means by which taxpayers in the individual districts participate in the management of public school education. *See id.* at 1021. Thus, we made explicit what was implicit in *Belier*: control over instruction is meaningless without control over local funding because local funding provides "the link connecting the local citizenry to their school district." *Id.* at 1022.

With this interpretation in place, we explained how our public school finance system achieves the important government interest of fostering local control. Allowing a district to raise and disburse its own funds enables the district to determine its own educational policy, free from restrictions imposed by the state or any other entity:

> The use of local taxes affords a school district the freedom to devote more money toward educating its children than is otherwise available in the state-guaranteed minimum amount. It also enables the local citizenry greater influence and participation in the decision making process as to how these local tax dollars are spent. Some communities might place heavy emphasis on schools, while others may desire greater police or fire protection, or improved streets or public transportation. Finally, local control provides each district with the opportunity for experimentation, innovation, and a healthy competition for educational excellence.

*Id.* at 1023; *see also Booth*, 984 P.2d at 648 (holding that local control over instruction means "substantial discretion regarding the character of instruction that students will receive *at the district's expense*") (emphasis added).

In *Lujan* we made clear that control over instruction is inextricably linked to control over locally-raised funds. The representative structure created in article IX, section 15 functions by entrusting locally-elected district board members with the discretion to disburse locally-raised tax revenues on education. In this way, district residents are able to tailor educational policy to meet the needs of the individual districts, without state interference.[8]

Given our analysis in *Lujan*, which relies and builds upon *Belier*, if we were now to

---

7. We also declined to find that there is a fundamental right to education in Colorado or that wealth was a suspect classification. *See Lujan*, 649 P.2d at 1018, 1021.

8. Local control has long been considered a means of guarding against excessive state involvement in education policy. The United States Supreme Court relied heavily on this view in *San Antonio Independent School District v. Rodriguez*, in which the Court observed:

> In part, local control means ... the freedom to devote more money to the education of one's children. Equally important, however, is the

> opportunity it offers for participation in the decisionmaking process that determines how those local tax dollars will be spent. Each locality is free to tailor local programs to local needs. Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence. An analogy to the Nation–State relationship in our federal system [is] uniquely appropriate.

411 U.S. 1, 49–50, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). For further sources on this issue see *Rodriguez*, 411 U.S. at 53 n. 109, 93 S.Ct. 1278.

hold that the constitutional local control requirement does not require control over locally-raised funds, we would undermine the rationale of our state-wide system of public school finance. Such a conclusion would force a reexamination of our public school finance policy and could result in a disruption of the present system.

### Booth

· The defendants contend that, notwithstanding the cases discussed above, our decision in this case should be controlled by our analysis in *Booth*. In that case, we considered the constitutionality of the Charter Schools Act's second-appeal provision. *See* § 22–30.5–108, 7A C.R.S. (2003). Specifically, we considered whether the General Assembly had the power to authorize the state board of education to approve a charter school application that a district board had twice rejected. We held that this scheme was constitutional because it struck an appropriate balance between state and local power in an area that invoked both the State's general supervisory powers under article IX, section 2 and the local districts' control of instruction under article IX, section 15. *See Booth*, 984 P.2d at 656.

In considering whether our analysis in *Booth* is applicable to this case, it is important to recognize the limited effect of the state board's second-appeal approval power in that case. The state board's decision did not direct the opening of the proposed charter school over the local board's objections. Rather, state approval of the second-appeal application simply required the local board to negotiate in good faith with the proponents of the charter school to resolve the objections that the local board had identified in its orders. denying the charter application. Through such negotiations, the local district and the proponents would arrive at a binding contract that would allow the charter school to open and operate on terms acceptable to the local district. *Id.* at 653–54. The charter school statute met constitutional requirements because it closely circumscribed the state board's authority in the appeals process while simultaneously preserving the local board's control of instruction given in the

charter school. The very limited nature of the state board's role is illustrated by the fact that we rejected as ultra vires the state board's attempt to order the local board to provide status reports on its future contract negotiations with the proponents. *Id.* at 655.

In this case, we are not asked to assess whether the state's constitutional authority to supervise education infringes on the local boards' constitutional authority to control instruction. Rather, under the Pilot Program, the local boards do not retain any authority to determine which schools or which students are eligible to participate in the program, the amount of district funds to be devoted to the program, or the character of instruction paid for by those funds. The Pilot Program deprives the school districts of all local control of instruction. Thus, there are no constitutional powers to balance in this case, and therefore *Booth* does not apply.

The question in this case is whether the Pilot Program satisfies the mandates of the local control requirement of article IX, section 15 and whether the Pilot Program fits within those parameters. To answer that question, we now examine the program itself, and our analysis is guided by the language of article IX, section 15 and our case law, cited above, construing that provision.

### The Pilot Program

 We review the trial court's assessment of the constitutionality of the Pilot Program de novo. *Gen. Motors Corp. v. City & County of Denver*, 990 P.2d 59, 67 (Colo. 1999). We begin with the presumption that the Pilot Program is constitutional, and we must uphold the legislation unless the challenging party proves it is unconstitutional beyond a reasonable doubt. *People v. Vasquez*, 84 P.3d 1019, 1021–22 (Colo.2004). In addition, we must uphold the statute unless "a 'clear and unmistakable' conflict exists between the statute and a provision of the Colorado Constitution." *E–470 Pub. Highway Auth. v. Revenig*, 91 P.3d 1038, 1041 (Colo.2004) (citation omitted).

The defendants argue that nothing in the language of article IX, section 15 ties control over instruction to authority to disburse locally-raised funds. In their view, local con-

trol means control over instruction per se, and does not implicate funding in any way.

This argument simply ignores nearly one hundred years of this Court's precedent clearly linking control over instruction to discretion to spend locally-raised funds. We have consistently held that control over instruction requires the local boards to retain substantial discretion "as to the character of ... instruction ... pupils shall receive *at the cost of the district.*" *Booth,* 984 P.2d at 648 (quoting *Sch. Dist. No. 16,* 60 Colo. at 294, 152 P. at 1149); *see also Belier,* 59 Colo. at 98, 147 P. at 356. And in *Lujan* we explained that the power to allocate locally-raised tax revenues ensures the districts a measure of democratic freedom from the state. *See Lujan,* 649 P.2d at 1023. Local authority over locally-raised funds preserves the representative body created by section 15 and gives substance to the constitutional requirement that local boards "shall have control of instruction in the public schools of their respective districts."

The Pilot Program violates these principles by requiring the school districts to pay funds—including those derived from locally-raised tax revenues—to parents, who in turn are required to pay those funds to nonpublic schools. § 22–56–108(3) and (4)(a). By denying local districts discretion to allocate their locally-raised funds, the program not only violates the clear mandates of our cases construing article IX, section 15, but also undermines the basic rationale of our state-wide school finance system: effectuating local control over public schools. *Lujan,* 649 P.2d at 1023. Thus, in accordance with *Lujan,* we hold that control over locally-raised funds is essential to effectuating local control of instruction, and the Pilot Program violates this requirement by stripping local districts of any discretion over the character of instruction participating students will receive at district expense.

The defendants also argue that school finance and "school choice" have evolved significantly since *Belier* was decided, and thus "[a]pplying the *Belier* rule is incongruous with today's school finance policy and would limit the General Assembly's authority over educational policy." As evidence, they point to the fact that currently, local tax revenues account for approximately forty percent of public school funds, whereas when the *Belier* line of cases were decided, nearly ninety-five percent of school funds were derived from local tax revenues.

Implicit in this argument is that with greater state funding comes greater state control over educational policy. This Court has long recognized, however, that the constitutional division of power between the state and local boards is not measured by funding. Hence, in *Craig,* we held that the state had plenary authority to implement a program that allowed students in one district to attend school in another district because the funds used to pay the transferring student's tuition came exclusively from the state controlled Public School Fund. *See Craig,* 89 Colo. at 148, 299 P. at 1067. To use the defendants' numbers, *Craig* was decided at a time when local tax revenues accounted for all but a small fraction of the public schools' operating budget. And yet we recognized that the state's power over its own funds was plenary in nature and did not depend in any way on the overall structure of school finance. *See Id.* Similarly, the amount of funding derived from local tax revenues as compared to state contributions is immaterial to our analysis of the level of discretion the Colorado Constitution confers on local school boards today.

At base, the defendants argue that the public schools have failed, and the General Assembly should have the power to address that failure through programs such as the Pilot Program. Thus, the defendants contend, the General Assembly has reasonably chosen to confer power over instruction directly upon the parents of public school children and allow them to choose to send their children to private school.

Our task is not to pass judgment on the wisdom of the General Assembly's policy choices. Rather, it is solely to determine whether those policy choices comport with constitutional requirements. Our analysis of article IX, section 15 reveals that the framers sought to empower the electors in each school district, including the parents of public school students, with control over instruction

through the creation of local school boards which would represent the will of their electorate. If the General Assembly wants to change this fundamental structure, it must either seek to amend the constitution or enact legislation that satisfies the mandates of the Colorado Constitution.

We hold that the Pilot Program as enacted by the General Assembly conflicts clearly and irreconcilably with the Colorado Constitution, and the plaintiffs have met their burden of proving the program is unconstitutional beyond a reasonable doubt.

### Conclusion

For the reasons given above, we hold that the Colorado Opportunity Contract Pilot Program, sections 22–56–101 to –110, violates the local control provisions of article IX, section 15 of the Colorado Constitution. Accordingly, we affirm the judgment of the trial court and return the case to that court for further proceedings consistent with this opinion.

Justice KOURLIS dissents.

Justice KOURLIS dissenting.

The Colorado Opportunity Contract Pilot Program (the "Pilot Program" or the "program"), §§ 22–56–101 to –110, 7A C.R.S. (2003), takes state and local education dollars, assigns them to a particular student who qualifies, and allows that student to expend the dollars on education at identified nonpublic institutions. Maj. op. at 936. The question before the court, simply stated, is whether that program violates article IX, section 15 of the Colorado Constitution, which gives school districts in this state control over the instruction that students receive in the public schools of their respective districts. Because the school district loses no control whatsoever over the education provided in its public schools, but merely loses some revenue that it would otherwise have, I do not view the program as unconstitutional.

The majority reaches its conclusion based in part on its understanding of our constitutional history and based in part on this court's precedent. I disagree that the historical context suggests today's outcome. Fur-

ther, although I agree that this court authored four cases dated between 1915 and 1931 that appear to equate local control over instruction with local control over educational tax dollars, in my view, the court has already moved away from that strict formulation in our more recent cases and it would be inconsistent with those modern cases to hold the Pilot Program unconstitutional. Accordingly, I respectfully dissent.

### I. Historical Background to Article IX of the Colorado Constitution

Article IX, section 15 of the Colorado Constitution states:

> The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. *Said directors shall have control of instruction in the public schools of their respective districts.*

Colo. Const. art. IX, § 15 (emphasis added). All parties agree that the outcome of today's case turns on our interpretation of the emphasized language. I think it is also true that all parties agree that the language of the constitution itself does not, on its face, preclude the Pilot Program.

In attempting to apply the dispositive constitutional article, we must also take into account article IX, section 1 of the Colorado Constitution. That provision states in relevant part that "[t]he *general supervision* of the public schools of the state shall be vested in a board of education whose powers and duties shall be as now or hereafter prescribed by law." Colo. Const. art. IX, § 1 (emphasis added).

Like the majority, I view the historical context as somewhat instructive. However, I find a different emphasis in that context than does the majority. To my reading, the drafters of our constitution intended to protect local schools from the political influences of the state legislature by assuring that local districts were able to retain the right to decide which textbooks to purchase, and which courses of instruction to offer.

As the majority notes, an initial draft of article IX, section 1 provided that "[t]he *supervision of instruction* in the public schools of this State shall be vested in a board of education, whose powers and duties shall be prescribed by law." *Proceedings of the Colorado Constitutional Convention for the State of Colorado* 185 (1907) (emphasis added). The majority holds that because delegates of the Colorado Constitutional Convention (the "convention") considered and rejected vesting the state board with supervisory authority over instruction, and instead granted authority over instruction to local school boards by way of article IX, section 15, there is to be no role for a state-level power, including the general assembly, to have any effect over the instruction funded by dollars raised by the local school district.

My review of the history suggests a different goal. As originally proposed, section 1 provided that all public schools would be managed by the state board of education (the "state board"). In that initial version as well, the state board was to consist of the State Superintendent of Public Instruction, the Secretary of State, and the Attorney General.[1] *Id.* One convention delegate opined that vesting the supervision of instruction in the state board placed too much power in the hands of three politicians who may or may not have adequate knowledge regarding the appropriate instruction of students. *Constitutional Convention,* Denver Daily Times, Feb. 12, 1876. That delegate "was of the opinion that school teachers and [local] superintendents ought to have a voice in the matter." *Id.* He argued that the supervision of instruction should be left with the "Teachers' Institutes of the Territory." *Id.* Another delegate agreed and explained that the supervision of instruction should rest with the "Teachers' Institutes or the local School Boards." *The Constitutional Convention,* Denver Daily Tribune, Feb. 14, 1876.

The majority acknowledges that various convention delegates were concerned that permitting the state board to supervise in-struction would inevitably lead to corruption in the process of choosing textbooks. Maj. op. at 938–939. One delegate expressed grave concerns that the section as proposed gave "unlimited power to fix the matter of text-books" to a body that was "purely political." *The Constitutional Convention,* Denver Daily Tribune, Feb. 14, 1876. While the state board was a necessary entity in the uniform oversight of public schools, many delegates believed that permitting it to control instruction would lead to inappropriate lobbying by textbook publishers. *Id.* Some delegates were surprised by the fact that other delegates read the phrase "supervision of instruction" as a potential mine of bribery. *Id.* It did not occur to them that "the Board of Education would have anything to do with the fixing of text books, but that [the state board] should have a general supervision of the public schools, ... assuming somewhat the powers of the General Superintendent of schools." *Id.*

"[T]o harmonize these conflicting sentiments, [one delegate] offered an amendment, making the first line of section 1 to read as follows: 'The general supervision of the public schools shall be vested in a Board of Education.'" *Id.* Stating his approval of the changed line, one delegate exclaimed that "[t]he principle [of removing the power of textbook selection from the authority of the state board] should be to distribute those [voting] majorities to as small a degree as possible, and bring it home to each district." *Id.* To this day, that line remains, nearly verbatim, in the constitution. Unlike section 1, section 15 of article IX passed the convention without amendment. *Proceedings of the Constitutional Convention for the State of Colorado* 360, 362–63 (1907) (then codified at section 16).

Thus, the history surrounding these sections suggests that the delegates to the convention were interested in securing to the local school boards the right to choose and buy textbooks, and the associated right to

---

**1.** A 1948 amendment to the constitution changed the make-up of the state board of education, replacing the superintendent with an appointed commissioner of education, and replacing the ex officio state board with an elected board that includes a member from each congressional district. S. Con. Res. No. 6, 36th Gen. Assemb. Reg. Sess., 1947 Colo. Sess. Laws 976, 976–77; Ch. 152, Colo. Const. art. IX, § 1, 1949 Colo. Sess. Laws. 359, 359–60.

oversee the course of instruction offered in the local schools. They were willing to assign an oversight role to the state board, but not a day-to-day control of curriculum.

It is against this historical backdrop that I view article IX, section 15 and the cases interpreting it.

## II. Analysis

### a. The *Belier* line of cases

In the early part of the Twentieth Century in Colorado, there was an insufficient population base to support a high school in every school district. Therefore, the legislature struggled with how to fund high schools that served more than one school district. In *Belier v. Wilson*, 59 Colo. 96, 147 P. 355 (1915), this court held that a tax levied on property in one school district in Otero County for the support of a high school in another school district in the same county was invalid. In a one-paragraph decision, the court held that the tax violated article IX, section 15, because the statute permitting the tax did not give "the electors in the former district any voice in the selection of those who manage and control the school at La Junta." 59 Colo. at 98, 147 P. at 356.

That same year, we decided *School District No. 16 v. Union High School No. 1*, 60 Colo. 292, 152 P. 1149 (1915). There, we reviewed a statute that permitted a student who resided in a school district without a high school to attend a high school in a different school district located in the same county of his residence at the expense of the student's local school district. 60 Colo. at 292, 152 P. at 1149. Because the statute did not grant the school district without the high school any degree of control over the instruction that its resident students would receive in the adjacent district at the expense of the student's resident district, we held that the receiving school was not entitled to a judgment against the sending school district for tuition fees. 60 Colo. at 293–94, 152 P. at 1149–50. We stated that "[t]he Legislature,

in providing for the education of the pupils of a given district in the schools of another district, and imposing the costs thereof upon the former, clearly interfered with the control of instruction in such district." 60 Colo. at 293, 152 P. at 1149.

In *Hotchkiss v. Montrose County High School*, 85 Colo. 67, 273 P. 652 (1928), we again reviewed a statute that permitted a student living in a school district without a high school to attend a high school in another school district in the same county at the expense of the student's local school district. Similar to the statutes at issue in *Belier* and *Union High School No. 1*, the statute under review in *Hotchkiss* compelled the local school district to fund the high school instruction that a student received in a different school district. 85 Colo. at 69, 273 P. at 653. Because the statute did not vest the local school district with any discretion over instruction, the court concluded that the statute violated article IX, section 15. *Id.*

The last in this line of old cases is *Craig v. People ex rel. Hazzard*, 89 Colo. 139, 299 P. 1064 (1931). There, we reviewed a statute that permitted a student residing in one district to attend a high school in another district at state expense. 89 Colo. at 142–44, 299 P. at 1065–66. Because the statute did not compel a school district to pay for instruction not under the district's control, we held that it did not violate article IX, section 15. We stated that "[i]t is eminently fair that a school district furnishing the education should be compensated therefor out of the [state] school income fund rather than to bestow all or a portion of such gratuity upon a county or school district not furnishing, and not required to pay for, such instruction." 89 Colo. at 148, 299 P. at 1067–68.

From these four cases, the majority draws the proposition that local control over instruction is synonymous with local control over all educational tax dollars.[2] I suggest that even these older cases do not go that far, and could not support a conclusion that

2. The funding sources for education have changed since 1935; whereas once local money financed education, now both state and local money support that function. *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1011 (Colo.

1982)("Since 1935, a combination of local property tax levies and direct state contributions has been the principal source of financial support for Colorado's public school system.").

local control over instruction means local control over all educational dollars that might come to the schools.

More importantly, I read our two most recent cases as having moved away from a formula that equates local control with local tax dollar discretion, and having rather embraced a balancing test that gives greater deference to education legislation enacted by the General Assembly.

### b. *Lujan* and *Booth*

The majority holds that our decision in *Lujan v. Colorado State Board of Education*, 649 P.2d 1005 (Colo.1982), reaffirmed the marriage of funding and control. There, we reviewed the constitutionality of the entire state school finance system. Because of varying property values throughout the state, some school districts were able to raise more revenue than other school districts, producing a disparity of funding among the various school districts in the state. *Id.* at 1013–14. The plaintiffs challenged that system, arguing that it violated the Equal Protection Clauses of the United States and Colorado Constitutions. *Id.* at 1014.

We reviewed the constitutionality of the school finance system under a rational basis review. Along those lines, we stated that to uphold the school finance system, the system had to be reasonably related to furthering a legitimate state purpose. *Id.* at 1022. Because the General Assembly had not identified a purpose with particularity, we had to infer the purpose from the statute itself as well as from other relevant enactments.

As part of that inquiry, we reviewed "the history of Colorado's educational system along with selected constitutional provisions and interpretive case law." *Id.* at 1023. Citing to article IX, section 15 of the Colorado Constitution, as well as to *Union High School No. 1*, among other cases, we stated that "[t]he historical development of public education in Colorado has been centered on the philosophy of local control." *Id.* at 1021. We explained that "[t]axation of local property has not only been the primary means of funding local education, but also of insuring that the local citizenry direct the business of providing public school education in their school district." *Id.* Thus, because the philosophy of local control was a pervasive theme both in the constitution and in our cases, we inferred that the purpose of the school finance system was to ensure local control. *Id.* at 1023.

Importantly, however, we made these pronouncements not to construe or interpret article IX, section 15, but only to identify the legislative purpose underlying the state school finance system. We stated that "utilizing local property taxation to partly finance Colorado's schools is rationally related to effectuating local control over public schools." *Id.* Thus, we relied on the *Belier* line of cases only to support the conclusion that the purpose of the Public School Finance Act was to ensure local control through local funding. We did not hold that such funding was the purpose of article IX, section 15.

Instead, the real import of *Lujan* is its emphasis on the complimentary constitutional roles of the state and local entities in providing public education. Far from enshrining the notion that local control equals local funding, *Lujan* underscores the necessary balance of control between the state and the local school district that must be considered in reviewing any piece of educational legislation.

Indeed, we specifically stated that judicial intrusions into the decisions of the General Assembly are to be avoided, "especially ... where the controversy ... is essentially directed toward what is the best public policy which can be adopted to attain quality schooling and equal educational opportunity for all children who attend our public schools." *Lujan*, 649 P.2d at 1018.

In *Lujan*, we did, indeed, recognize very important principles-but not, in my view, the ones that the majority endorses. Rather, we recognized that every eligible student in the state has a right to a free and thorough education, and that both the state and the local governmental entities have a role in fulfilling that promise. *Id.* at 1025. Hence, the actions of the general assembly must be judged against its charge to provide a free and uniform system of public schools within

each school district, and against whatever level of control is needed by the local school district to implement the state's mandate. *Id.*

That pronouncement hearkened back to *Wilmore v. Annear,* 100 Colo. 106, 115, 65 P.2d 1433, 1437 (1937), where we held that "the establishment and financial maintenance of the public schools of the state is the carrying out of a state and not a local or municipal purpose." Indeed, "[b]y vesting the power in districts to levy and collect taxes for the support of the school or schools in such districts, the state was but adopting a means for carrying out its purposes." *Id. Wilmore* made clear that local funding is a mechanism to implement the state-wide responsibility regarding education; it is not an end to itself.

Against that backdrop, and affording the legislature a strong presumption of constitutionality, we upheld the state's system of public funding in *Lujan.* 649 P.2d at 1025. *Lujan* stands for the proposition that both the general assembly and the local school board have a role in assuring that we meet our educational responsibilities.

That careful balancing of responsibilities is even clearer in our most recent relevant case, *Board of Education of School District No. 1 v. Booth,* 984 P.2d 639 (Colo.1999). In *Booth,* we reviewed a constitutional challenge to a portion of the Charter Schools Act, section 22–30.5–108(3), 7A C.R.S. (2003). The statute at issue in that case permitted an applicant charter school to appeal to the state board of education a local school district's denial of its application. The statute instructed the state board to determine whether the local school board's denial of the application was " 'contrary to the best interests of the pupils, school district, or community.' " *Id.* at 643 (quoting § 22–30.5–108(3)(d)). If the state board found that the local school board's decision was contrary to those interests, the statute directed it to remand the decision back to the local board " 'with instructions to approve the charter application.' " *Id.* (quoting § 22–30.5–108(3)(d)).

In that case, the local school board had denied a charter school application. On appeal, finding that the denial of the application was contrary to the best interests of the pupils, school district, or local community, the state board ordered the local board to approve the application. *Id.* at 644. The local school board challenged that decision, arguing that the appeal provision of section 22–30.5–108(3) violated the "control of instruction" clause of article IX, section 15, because it interfered with the management of local resources. *Id.* at 645. The state board countered that the statute was constitutional because it was passed pursuant to article IX, section 1 of the Colorado Constitution, which grants the power of "general supervision" to the state board. *Id.*

We rejected both of these categorical arguments "because each fail[ed] to recognize or reconcile the potential for competing responsibilities created by the constitution." *Id.* at 645. In considering those competing responsibilities, we distanced ourselves from the assumption—prevalent in *Belier* and its progeny—that any effect on a school district's financial resources triggered its right to control instruction. In so doing, we applied a concept of "control of instruction" that did not involve money, but that contemplated instead a school district's responsibility to oversee and implement its educational programs—a notion that the local board had the right to control the instruction for which it was to be held accountable.

We first took note of the general assembly's primary constitutional responsibility concerning education-its duty to "provid[e] for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state." *Id.* (quoting Colo. Const. art. IX, § 2). We stated that "[a]ny meaningful regulation in furtherance of this responsibility, whether it involves *curriculum,* facilities, programs, management, services, or employment, will inevitably influence the allocation of resources." *Id.* (emphasis added). In that vein, we stated that "[w]e will not seriously entertain the notion that the General Assembly's constitutional responsibility for public education can be carried out only to the extent that its regulations have no discernable effect on local resources." *Id.* We then held that pursuant to article IX, section 1, the state board is "to

serve as both a conduit of and a source for educational information and policy, and they [the framers of the constitution] intended the General Assembly to have broad but not unlimited authority to delegate to the State Board 'powers and duties' consistent with this intent." *Id.* at 648 (quoting Colo. Const. art. IX, § 1).

We held that the district's control of instruction "requires power or authority to guide and manage both the action and practice of instruction as well as the quality and state of instruction" and involves "substantial discretion regarding the character of instruction that students will receive at the district's expense." *Id.* at 648. Thus, "[a]s long as a school district exists, the local board has undeniable constitutional authority." *Id.* at 646. Nevertheless, "just as even core constitutional rights are not absolute, this constitutional authority is subject to limits." *Id.* Accordingly, "[t]he contours of constitutional rights are typically determined by balancing competing interests." *Id.* Hence, a school district's right to local control is not absolute and must be weighed against other considerations.

After noting the competing roles and responsibilities of the general assembly and the school districts, we proceeded to develop a specific balancing test in order to reconcile the competing interests presented in that case. We weighed the authority of the state board as an extension of the General Assembly on the one hand against the local board as an extension of the school district on the other. *Id.* at 646–648. The overarching purpose of the *Booth* test, we stated, was to determine whether the legislation at issue unduly interfered with the local school district's constitutional authority.[3] *Id.* at 649.

As formulated, that test permits the local board's control of instruction and any concomitant discretion to be "restricted or limited ... by statutory criteria and/or judicial review" provided that any such limitations do "not have the effect of usurping the local board's decision-making authority or its ability to implement, guide, or manage the educational programs *for which it is ultimately responsible.*" *Id.* (emphasis added). Thus, we held that "in the context of novel education reform legislation, we cannot attempt a definitive constitutional demarcation." *Id.* Rather, we must take the principles of the balancing test and "review each case on its facts." *Id.* at 650. We must apply that understanding in reviewing "the statute whose language and operation are specifically before us." *Id.*

Where the statute advances a legitimate educational purpose, we give deference to the balance that the General Assembly sought to maintain between state authority and local board authority.[4] *Id.* at 650. We presume that balance is permissible unless it poses a clear impediment upon either the state actor or the local board to exercise its own constitutional authority. *Id.* Foremost, the party alleging that the statute is unconstitutional bears the burden at all times of proving that the statute is unconstitutional beyond a reasonable doubt. *Id.*

With these principles in mind, I turn to the General Assembly's role in passing the Pilot Program and the effect of the program upon

---

3. The majority states that *Booth's* balancing test is triggered only when a statute pits the state's constitutional authority to supervise education against the local boards' constitutional authority to control instruction. Maj. op. at 942. I suggest that this case does involve just such a tension, *see* § 22–56–106, 7A C.R.S. (2003), but even if it does not, I view the fundamental holding of *Booth* to be that local control is not absolute, but is, rather, a component to be weighed in the constitutional equation. *Booth* provides a framework to review all "novel educational reform" in all cases where a local school district alleges interference with its right to control instruction, as here. *Booth*, 984 P.2d at 649. This case presents just such a controversy, and therefore invokes the *Booth* balancing test.

4. Section 22–56–102, 7A C.R.S. (2003), states that "meeting the educational needs of high-poverty low-achieving children in our state's highest-poverty public schools is of the greatest importance to the future welfare of Colorado," § 22–56–102(a), and that the purpose of the Pilot Program is to provide "a broader range of educational options to parents ... utilizing existing resources and educational structures [that] may help high poverty, low-achieving students improve their academic achievement," § 22–56–103(c). There is no dispute that the Pilot Program attempts to effectuate a legitimate educational purpose.

the local board's constitutional authority to control instruction.

### c. The Pilot Program

The Pilot Program directs "[a] nonpublic school that chooses to participate in the pilot program [to] file an application with a school district." § 22–56–106(1), 7A C.R.S. (2003). In that application, the nonpublic school must provide the school district with information that indicates it meets certain standards. *Id.* First, the nonpublic school cannot discriminate in admissions "on the basis of race, color, religion, national origin, or disability." § 22–56–106(1)(b). Second, the nonpublic school must not "advocate or foster unlawful behavior or teach hatred of a person or a group." § 22–56–106(1)(c). Third, the nonpublic school must meet all health and safety laws or codes applicable to public schools. § 22–56–106(1)(d). Fourth, the nonpublic school must agree to let the school district, at the nonpublic school's expense, administer statewide assessment exams for those children attending the nonpublic school under the program. § 22–56–106(1)(e). Fifth, the nonpublic school must perform background checks on its employees. § 22–56–106(1)(f). Finally, the nonpublic school must permit students attending the school through the Pilot Program to withdraw at any time. § 22–56–106(1)(g). The nonpublic school must reaffirm that it meets these standards each year that it wishes to continue in the program. § 22–56–106(4).

The school district has little discretion to refuse enrollment in the program to eligible students, § 22–56–104(2), 7A C.R.S. (2003), but it may deny participation in the program to a nonpublic school for failing to meet the standards listed above. § 22–56–106(3)(b)(II). Within thirty days of a denial, the nonpublic school may appeal the decision to the state board. § 22–56–106(3)(c).

The Pilot Program may be funded in part through local revenue from the school districts affected by the program.[5] It is also

funded by state dollars. There is even evidence to suggest that federal dollars make up a portion of the total contribution.

The majority concludes that because the program interferes with the local school districts' control over instruction financed to any extent by locally-raised funds, it is unconstitutional. I disagree. Rather, applying the directives of *Booth*, I find that the opponents to the program have failed to meet their burden of demonstrating unconstitutionality.

*Booth* instructs us that a "generally applicable law triggers control of instruction concerns when applied to specific local board decisions likely to implicate important education policy." 984 P.2d at 649. There, we upheld an innovative state program that clearly interfered to some extent with local control over instruction because it did not have the effect of "usurping the local board's decision-making authority or its ability to implement, guide, or manage the educational programs for which it is ultimately responsible." *Id.*

Article IX, section 15, provides that the directors of the state's school districts "shall have control of instruction in the *public schools* of their respective districts" (emphasis added). School districts—with or without the Pilot Program—are not ultimately responsible for the instruction that students receive at nonpublic schools. Similarly, the Pilot Program does not affect the local board's ability to implement, guide, or manage the instruction that students do receive at public schools. In my view, the incursions into local control that the Pilot Program represents are nowhere near as serious as those we have already upheld in *Booth*.

*Booth*, in particular, directs our focus back to the plain language of article IX, section 15, and instructs us to review the Pilot Program out from under the shadows of constitutional interpretation that *Belier* and its progeny cast upon the majority's holding. *Booth*, 984 P.2d at 653 n. 6. Booth further acknowledges

---

5. The question of whether the local dollars do, indeed, comprise a portion of the funding may be just an accounting issue. Since the legislation provides that only 7% of the students in the district can ever participate in the program, and

since the State unequivocally provides at least 50% of the funding, it seems to me that there is an open question about which dollars are going where.

that "[w]e have traditionally treated education policy choices with special deference and are particularly averse to the judicially intrusive effect of invalidating a statute in this context." *Id.*

The language of the constitution itself does not in any way preclude the Pilot Program. Instead, the only support for that conclusion arises out of cases that responded to educational dilemmas entirely different from those faced today-cases that this court has already discounted in its more recent pronouncements. Legislatures must be innovative and creative in their policy decisions. Courts, in turn, must evaluate those innovations against the more stable drumbeat of constitutional mandate and precedent. Here, I see no conflict between the constitution and the Pilot Program.

#### d. Special Legislation

Since I would otherwise hold the statute constitutional, I would need to reach Plaintiffs' argument that the Pilot Program was passed as "special legislation" in violation of article V, section 25 of the Colorado Constitution. In that regard, I would affirm the district court's dismissal of the claim, for all of the factual and legal reasons so aptly set forth by the district court in its opinion of December 3, 2003.

### III. Conclusion

Because I do not believe that the Pilot Program violates either the language or the spirit of the constitutional provision protecting local control over instruction offered in public schools, I conclude that the Pilot Program is constitutional. Accordingly, I would reverse the district court on that basis, and would remand for further consideration of any remaining issues.

I am authorized to state that Justice RICE and Justice COATS join in this dissent.